795 A.2d 260 (2001)
350 N.J. Super. 276
Donald A. DONOFRY and Madeline E. Donofry, Plaintiffs-Respondents/Cross-Appellants,
v.
AUTOTOTE SYSTEMS, INC., Defendant-Appellant/Cross-Respondent,
Sital Singh DHANOA, Defendant-Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 2000.
Decided September 27, 2001.
*264 Kenneth F. Oettle, Newark, argued the cause for appellant/cross-respondents (Sills Cummis Radin Tischman Epstein & Gross attorneys; Mr. Oettle, of counsel; Mr. Oettle and Debra M. Lightner, on the brief).
John M. Donnelly argued the cause for plaintiffs/cross-appellants (Levine, Staller, Sklar, Chan, Brodsky & Donnelly, attorneys; Mr. Donnelly of counsel; Mr. Donnelly, Scott J. Mitnick and E. Allan Mack, Atlantic City, on the brief).
Before Judges SKILLMAN, WECKER and LESEMANN. *261 *262
*263 The opinion of the court was delivered by WECKER, J.A.D.
This is defendant's appeal from a verdict entered after a bench trial on a whistleblower claim brought under the Conscientious Employees' Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. Plaintiff cross-appeals the dismissal of his punitive damages claim as well as his tort claim against the individual defendant. The primary issues raised by this appeal are the proper burden of proof and the sufficiency of the judge's findings to support the verdict.
Plaintiff, Donald Donofry,[1] was employed by defendant Autotote Systems, Inc. (defendant or Autotote) as General Manager at its facility at the Atlantic City Race Track, known as the Hub. Defendant, which operates simulcasting facilities from racetracks around the country, sent simulcast signals to several Atlantic City casinos from this location. The Casino Simulcasting Act, N.J.S.A. 5:12-194(b), and its implementing regulation, N.J.A.C. 19:55-6.3, required the technicians operating the equipment in the Hub to be licensed by *265 the Casino Control Commission. Plaintiff was discharged shortly after he informed Autotote's senior management, through their local counsel, that unlicensed technicians were working at the Hub facility, thus necessitating admissions to the Commission that prompted disciplinary action and threatened Autotote's casino license.
Plaintiff was awarded compensatory damages, attorneys' fees and costs against Autotote. However, the judge denied plaintiff's demand for punitive damages and dismissed his claim against defendant Sital Singh Dhanoa, Autotote's district manager and plaintiff's immediate supervisor, for tortious interference with prospective economic advantage.[2]
On appeal Autotote contends that the judge erred in finding retaliation under CEPA because plaintiff would have been fired anyway for several reasons, and because plaintiff was himself a "transgressor" who cannot succeed under CEPA. Defendant contests the amount of the compensatory damage award on the ground that the judge should not have assumed that plaintiff would have worked until age seventy. Finally, defendant contends that the award of attorneys' fees was excessive. On his cross appeal, plaintiff contends that the judge should not have dismissed his claim against Dhanoa, should have awarded punitive damages, and improperly reduced his requested attorneys' fees and costs. Based upon our review of the record, the briefs, and the arguments of counsel, all under applicable law, we affirm.
A brief summary of the facts surrounding plaintiff's employment and his termination will suffice to place this appeal in context.
Plaintiff was first hired by defendant in 1993 to fill an administrative position as general manager of defendant's Atlantic City Hub. The technical work of the Hub is performed on totalisator ("tote") equipment that is essential to the simulcasting operation. The equipment is maintained in a secure room, known as the tote room. The tote room manager was Brian Rogers, who supervised the technical work of the operators.
The tote room equipment is operated only by specially trained persons, who are required by law to be licensed by the Casino Control Commission. The operators, other than the manager of the tote room, were members of the International Brotherhood of Electrical Workers (IBEW), which was threatening to strike in the spring and summer of 1994. As a result, the company began to develop a strike contingency plan, including training plaintiff to operate the equipment and hiring additional tote operators. In June, the company applied to the Commission for a temporary waiver of the licensing requirements for tote room operators in the event of a strike; however, the waiver was denied.
On the defendant's organizational chart, filed with the Casino Control Commission, Rogers answered to plaintiff. However, because plaintiff's job and his background was on the administrative and not the technical side of the operation, Rogers responded directly to Dhanoa with respect to the operation. It was Rogers, with Dhanoa's *266 approval, who made the decisions to hire new or replacement personnel for the tote room. Dhanoa reported to Brooks Pierce, who was then the Vice President and General Manager of Autotote. By 1998, when Pierce testified at this trial, he had become President of the company.
Autotote had retained local counsel, Mark Sandson, to facilitate its regulatory affairs involving the Casino Control Commission. Sandson handled a variety of legal matters for defendant in Atlantic City, including the waiver application, and plaintiff frequently had occasion to consult him. Sandson or his office staff oversaw the process of obtaining the required licenses for defendant's tote room personnel, and plaintiff was involved in transmitting the applications between the employees and Sandson.
In August, the tote room operators did go out on strike at Autotote's facilities across the country, and it became a major priority of the company to keep the operations running with substitute personnel. At various times during the summer and fall of 1994, three persons who were employed in the tote room at the Hub were not licensed as required. Those persons were hired by Rogers, but plaintiff became aware of their status and made some attempts to discourage the practice as he became more and more "uncomfortable" with the situation. He reported the situation to Dhanoa, and instructed Rogers to get the unlicensed people out of the tote room, but Rogers saw no way to keep the operation going without them, and they remained. Plaintiff tolerated the situation until mid-October.
At some point in October, plaintiff learned that one of the three unlicensed tote room employees had been sent to work on the simulcasting equipment at the Taj Mahal and had been turned away by the casino because he was unlicensed. At the time, Autotote's own application for a plenary casino service industry license was before the Commission, and plaintiff became more disturbed about the potential for repercussions with the Commission. On October 18, 1994, plaintiff went to Sandson, and knowing Sandson would have to report the matter to upper management and to the Commission, told him about the several individuals who were operating the tote room equipment without the proper casino licenses.[3] Sandson recognized the threat to Autotote's application if the violations became known. In a telephone conference with Pierce the same day, plaintiff and Sandson reported the situation to him. It was determined that it was in Autotote's interest to disclose the matter to the Commission itself, rather than risk its discovery.
As a result, the plenary license application was postponed, and administrative charges were lodged by the Commission against Autotote and against plaintiff, Dhanoa, Rogers, and one of the unlicensed employees. Each was represented by separate counsel provided by Autotote, and the charges against each were resolved by settlement based upon written stipulations entered on or before December 14, 1994. Each entered a guilty plea to a violation, and Donofry paid a $1,100 fine. Autotote was also fined $25,400. In his written stipulation of settlement, plaintiff as well as Dhanoa and Rogers admitted some responsibility for the unlicensed operators. Autotote also admitted its responsibility for the violations. On that same date, the Commission granted Autotote's plenary license. Both Sandson and separate counsel engaged to handle the plenary license *267 application testified at this trial that having reported its own violations to the Commission was helpful in securing the plenary license.
According to plaintiff, on December 13, 1994, he called Pierce "to find out what my disposition was after the hearing," and Pierce "told me that I was terminated." When plaintiff asked why, Pierce "told me because I cost the company a lot of money and that I jeopardized their license that they were going for the next day, their permanent license, and also that they were in the process of negotiating the New Jersey Lottery."
Pierce did not deny giving plaintiff those reasons, but added that he terminated plaintiff because he thought that as general manager of the facility, plaintiff "was responsible for what was going on at the HUB." Pierce "felt that [plaintiff] basically allowed unlicensed people to work under his watch and I felt that he was personally responsible for it." Pierce denied that plaintiff's disclosure played "any part" in his decision. "I fired him because he knew what was going on right from the beginning. He allowed it to happen and the fact that ... he confessed to that a month and a half later, to me was not justification...." Plaintiff "knowingly and willingly let this happen".
Pierce asserted that he initially decided to terminate plaintiff on October 18 when he talked to Sandson and to plaintiff by telephone. He did not discuss it with his subordinates because "it was a plain as day decision." He did ask Sandson whether his decision was "off base." He also asked Autotote's general counsel to verify that. He made no other investigation of the circumstances, except a call to Dhanoa. He later learned that Dhanoa lied when he claimed not to have known about the unlicensed employees.
In distinguishing his treatment of plaintiff from his treatment of Rogers and Dhanoa, Pierce testified that he did not find Rogers culpable because his responsibility was "to make sure the tote system was up and running," whereas plaintiff's responsibility was to ensure that employees were licensed.
Pierce also explained that he felt that Dhanoa was not personally responsible because he was not present at the site of the violations. Pierce agreed on cross-examination that Dhanoa's technical expertise and employment history with defendant were part of his reason for retaining him. Pierce claimed that he did not find out that Dhanoa had lied about his own knowledge of the unlicensed workers "until this case started, [un]til we got to the depositions and started talking about it."
The only other evidence at trial with respect to the company's motivation for firing plaintiff is the record of the December 14 Commission hearing on the pending plenary license application, when outside counsel argued that Autotote terminated plaintiff "to show this Commission that it [is] aware of the stringent requirements of this regulatory scheme."
In his letter opinion, the trial judge made the following critical findings:
If that was [plaintiff's supervisor's] only reason for terminating plaintiff, as callous as it may have been, it would not be actionable. Plaintiff was an at-will employee, so defendant did not need a good reason to fire him. Despite [the supervisor's] protestations to the contrary, I conclude that the fact that it was plaintiff who brought this situation to light more probably than not contributed to the decision to terminate him.... No one would ever have known but for plaintiff's revelations. There had to be some element of retribution in the decision to fire only plaintiff and not the two *268 others who equally shared the blame for the unlicensed workers. It's only human nature. I conclude, therefore, that the fact that it was plaintiff who "blew the whistle" played a significant part in the decision to fire him.
At the outset, we reject defendant's argument that the plaintiff's own role in allowing the unlicensed employees to work in the tote room precludes his recovery. We are not aware of any New Jersey case holding that plaintiff's participation in the unlawful conduct he reports is a per se bar to a whistleblower claim. See Paolella v. Browning-Ferris, Inc., 158 F.3d 183, 191 (3d Cir.1998)(applying Delaware's whistleblower law):
Although the exceptions to the at-will doctrine are to be narrowly drawn, the policy reasons for protecting whistleblowers remain whether or not the employee can avoid involvement in the illegal activity.
See also Jacobs v. Universal Dev. Corp., 53 Cal.App. 4th 692, 702, 62 Cal.Rptr.2d 446, 451 (1997). When an employer defending a whistleblower claim contends that its employee's unlawful conduct by itself, and not the employee's whistleblowing activity, was the determinative factor in a firing, the employee's conduct surely will be part of the picture from which a factfinder will determine whether the employer acted with a retaliatory motive; but it is not the whole picture.
A review of any judgment on appeal requires that we consider whether the findings of fact were supported by sufficient credible evidence, and whether the law was properly applied to those facts. In the case of a jury trial, we approach the second consideration by examining the jury charge. If the instructions correctly reflect the applicable law, we infer that the jury reached its conclusions based on a proper application of the law to the evidence. When the trier of fact is the judge, we depend upon the judge to articulate the legal basis for his decision, that is, the elements of the plaintiff's cause of action and the applicable burden of proof.
The trial judge here provided a written opinion which carefully set forth the evidence adduced and his findings thereon. As defendant contends, the opinion did not, however, articulate the legal standard against which the judge weighed the evidence and found that evidence tipped the scales in plaintiff's favor.
Our review of the record nevertheless satisfies us not only that the judge's findings of fact are adequately supported by credible evidence, thereby warranting our deference under Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974), but also that having ourselves measured those findings against the elements of a CEPA cause of action and the applicable burden of proof, the judgment should be affirmed.
We are also satisfied that the judge properly dismissed plaintiff's claim for punitive damages, there being insufficient evidence of egregious conduct, and that plaintiff's tort claims against Dhanoa were properly dismissed for lack of proof of the requisite intent or proximate cause. We find insufficient merit in plaintiff's arguments on these points of his cross-appeal to warrant further discussion in this opinion. See R. 2:11-3(e)(1)(E).
We shall explain why we conclude that the trial judge properly found that plaintiff proved his CEPA claim. N.J.S.A. 34:19-3(a) prohibits retaliatory action against an employee who: "Discloses ... to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law...."
*269 It is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim. E.g., Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994); Kolb v. Burns, 320 N.J.Super. 467, 477, 727 A.2d 525 (App.Div.1999). It is also plain that the methods of proof and the applicable burdens in LAD and CEPA cases generally follow Title VII law, and we therefore frequently look to federal as well as state discrimination and retaliation cases as precedent. E.g., Mogull v. C.B. Commercial Real Estate Group, Inc., 162 N.J. 449, 461-62, 744 A.2d 1186 (2000); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 549-50, 569 A.2d 793 (1990); Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193, 536 A.2d 237 (1988); Kolb v. Burns, supra, 320 N.J.Super. at 478-79, 727 A.2d 525; see also Bowles v. City of Camden, 993 F.Supp. 255 (D.N.J.1998): "The elements necessary to prove a retaliatory discharge claim under CEPA are similar to those necessary to prove a violation of Title VII [of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e]. Therefore, we will utilize principles from the Title VII landscape in analyzing plaintiff's CEPA claims." Id. at 261.
There are two frameworks, or approaches, to proving a discrimination or retaliation claim: pretext and mixed motive.[4] The critical distinction between the two is the extent to which the plaintiff relies upon inferences from the circumstances to establish a causal connection between the discrimination or retaliation and the firing or other adverse action suffered by the employee. There is little question that this is a pretext case, and we shall analyze it accordingly. In a pretext case, once the plaintiff establishes a prima facie case, only the burden of producing evidence shifts to the defendant. In a mixed motive case, however, because the plaintiff produces more direct evidence of the unlawful motive, the burden of persuasion is also shifted to the defendant. See generally, Kolb v. Burns, supra, 320 N.J.Super. 467, 727 A.2d 525; Bowles v. City of Camden, supra, 993 F.Supp. 255. We see no evidence that the judge shifted the burden of proof to defendant.
Under a pretext theory, in order for plaintiff to establish a prima facie case of unlawful retaliation, he had to present evidence that (1) he reasonably believed that allowing unlicensed employees to operate the tote room violated casino law; (2) that he reported it to a supervisor or public authority; (3) that he was fired; and (4) that there was a causal connection between his reporting and his firing. See Kolb v. Burns, supra, 320 N.J.Super. at 476, 727 A.2d 525; see also Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210, 723 A.2d 944 (1999); Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30, 660 A.2d 505 (1995). There is no dispute here that plaintiff's proofs satisfied the first three elements of the claim. As in most CEPA cases, the trial and now the appeal turn on the fourth element: evidence of a causal connection. Specifically, we are called upon to focus on the nature of the required causal connectionthat is, the definition of proximate causein a CEPA case.
"Pretext" as a means of meeting plaintiff's burden of proof was initially described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L. Ed.2d 668, 677 (1973) "to address the difficulty in obtaining direct evidence of discrimination." Bowles, supra, 993 F.Supp. at 261. Pretext triggers a *270 presumption that enables the employee to "prove an employer's discriminatory intent through circumstantial evidence." Bergen Commercial Bank v. Sisler, supra, 157 N.J. at 209, 723 A.2d 944. Recognition that direct evidence of motive or intent is often unavailable to an employee who has suffered an adverse employment decision is merely a specific application of a more general proposition:
[I]ntent is [a] condition of the mind which cannot be seen and can only be determined by inferences from conduct, words or acts.
A state of mind is rarely susceptible of direct proof, but must ordinarily be inferred from the facts.... It is within your power to find that such proof has been furnished beyond a reasonable doubt ... from all of the surrounding circumstances.
[Model Jury Charge (Criminal), "State of Mind" (2000).]
Under the pretext theory, once the plaintiff establishes a prima facie case, the evidentiary burden on the employer is to advance "a legitimate, non-discriminatory reason for its rejection of the employee." Sisler, supra, 157 N.J. at 210-11, 723 A.2d 944. The plaintiff retains the ultimate burden of proving that the retaliatory motive played a determinative role in the adverse decision. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L. Ed.2d 407, 419 (1993); Sisler, supra, 157 N.J. at 211, 723 A.2d 944; Erickson v. Marsh & McLennan Co., supra, 117 N.J. at 550, 569 A.2d 793. As in any cause of action, plaintiff can meet that burden by means of circumstantial as well as direct evidence, or a combination of the two. One way the employee can do this is by proving that the employer's articulated reason "was not the true reason for the employment decision but was merely a pretext for discrimination." Sisler, supra, 157 N.J. at 211, 723 A.2d 944 (quoting Andersen v. Exxon Co., 89 N.J. 483, 493, 446 A.2d 486 (1982)); see also Romano v. Brown and Williamson Tobacco Corp., 284 N.J.Super. 543, 551, 665 A.2d 1139 (App.Div.1995).
That is simply another way of saying that the factfinder is permitted to draw an inference of a guilty state of mind from a defendant's proffer of false evidence. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L. Ed.2d 105, 119-20 (2000). The extent of the falsity and defendant's awareness thereof determine the strength of the negative inference. If it is strong enough, it can, along with plaintiff's prima facie case, prove the causal connection. Id. at 148, 120 S.Ct. at 2109, 147 L.Ed.2d at 120-21. It is this reliance upon circumstantial evidence of the defendant's motive that gives plaintiff's case the shorthand label of a pretext case.
Defendant here offered some evidence that plaintiff was terminated because of his role in the employment of unlicensed workers in the tote room, by itself a lawful explanation for a firing. Thus the burden of producing evidence shifted back to plaintiff. Plaintiff relied in part upon evidence that neither Dhanoa nor Rogers were terminated for their involvement, which was equally if not more culpable than his own. Plaintiff also relied on the inference to be drawn from the timing of his firing, less than two months after he blew the whistle and while defendant's license application was pending.
When a defendant offers affirmative, credible evidence of a lawful reason for the termination, that does not necessarily end the pretext case. The legal issue raised here, where the defendant contends that the factfinder ignored credible evidence of several lawful reasons for *271 plaintiff's termination,[5] is the extent of plaintiff's ultimate burden of persuasion. To prove a CEPA claim, the plaintiff must show that the "retaliatory discrimination was more likely than not a determinative factor in the decision." Kolb, supra, 320 N.J.Super. at 479, 727 A.2d 525 (quoting Bowles, supra, 993 F.Supp. at 262). Substituting "retaliation" for "discrimination," we find the plaintiff's burden to be as described by the Court in Sisler, an age discrimination case:
Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional [retaliation]. In meeting that burden, the "plaintiff need not prove that [retaliation] was the sole or exclusive consideration" in the determination to discharge him; rather, he need only show "by a preponderance of the evidence that it made a difference" in that decision.
[157 N.J. at 211, 723 A.2d 944 (quoting Murray v. Newark Hous. Auth., 311 N.J.Super. 163, 174, 709 A.2d 340 (Law Div.1998)); (other citations omitted).]
The trial judge clearly gave some credence to evidence of one lawful reason for defendant to have terminated plaintiff, a reason that by itself would not be actionable. That evidence was Sandson's testimony that when a violation is found, in the judge's words, "the [Commission] liked to see a responsible employee suffer serious consequences for a violation of the Casino Control Regulations." And although Rogers and Dhanoa "were as culpable as plaintiff," the judge concluded "that plaintiff was sacrificed to the CCC because he was the easy one to terminate; he could easily be replaced, while Rogers and Dhanoa could not." The judge went on to find that:
[I]f that was Pierce's only reason for terminating plaintiff, as callous as it may have been, it would not be actionable. Plaintiff was an at-will employee, so defendant did not need a good reason to fire him.
But the judge continued:
Despite Pierce's protestations to the contrary, I conclude that the fact that it was plaintiff who brought this situation to light more probably than not contributed to the decision to terminate him. (emphasis added.)
The judge's final conclusion was: "the fact that it was plaintiff who `blew the whistle' played a significant part in the decision to fire him." (emphasis added.)
Defendant argues that the judge's use of the term "significant part" does not rise to the required level of "determinative factor." We rejected a similar argument in Rendine v. Pantzer, 276 N.J.Super. 398, 432, 648 A.2d 223 (App.Div.1994), aff'd, 141 N.J. 292, 661 A.2d 1202 (1995):
[D]efendant first complains about the judge's repeated use of the term "substantial factor" in his explanation that each plaintiff must prove that her maternity leave and child birth were a "substantial factor" in her treatment by defendant. Our Model Jury Charges, Civil 2.21A(1) at 4 (May 1991) uses the term "a determinative factor." The judge here used the terms "a determinative factor" and "a substantial contributing factor." In view of the judge's use of these terms interchangeably, we think *272 that no difference was conveyed in meaning between "determinative" and "substantial." Defendant himself requested the use of the word "substantial" in the jury interrogatories and should not complain about its use in the charge. Moreover, the absence of a contemporaneous objection by manifestly competent trial counsel belies the nowalleged significance of this claim of error.
New Jersey LAD and CEPA cases that have described the nature of a plaintiff's burden to prove discriminatory or retaliatory intent repeatedly use the adjectives "determinative," "substantial," and "motivating" to describe the unlawful motive as a requisite factor in an adverse employment decision. See, e.g., Mogull, supra, 162 N.J. 449, 744 A.2d 1186 ("a determinative, motivating factor," "a determinative factor," Id. at 463, 744 A.2d 1186; "a motivating factor," Id. at 465, 744 A.2d 1186); Blume v. Denville Tp. Bd. of Educ., 334 N.J.Super. 13, 40, 756 A.2d 1019 (App.Div.2000)("a substantial or a determinative factor"); Mattiello v. Grand Union Co., 333 N.J.Super. 12, 17, 754 A.2d 563 (App.Div.), certif. denied, 165 N.J. 677, 762 A.2d 658 (2000)("a determinative motivating factor"; "a determinative factor"; "it made a difference"); Kolb v. Burns, supra, 320 N.J.Super. at 479, 727 A.2d 525 ("a determinative factor"); Bergen Commercial Bank v. Sisler, supra, 307 N.J.Super. 333, 347, 704 A.2d 1017 ("a motivating, determinative factor"); Jackson v. Georgia Pacific Corp., 296 N.J.Super. 1, 17, 685 A.2d 1329 (App.Div.1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997)(jury instruction "`that plaintiff's race was a determinative factor' ... was precisely what was required under McDonnell Douglas"); Romano v. Brown and Williamson Tobacco Corp., supra, 284 N.J.Super. at 551, 665 A.2d 1139 (retaliation "more likely than not motivated defendant's action"); Rendine v. Pantzer, supra, 276 N.J.Super. at 436, 648 A.2d 223 (affirming jury verdict on LAD claim where jury was instructed that plaintiffs must prove the unlawful motive "was a substantial factor," and concluding that "[t]he jury clearly found unlawful discrimination a contributing factor"); Maiorino v. Schering-Plough Corp., 302 N.J.Super. 323, 344, 695 A.2d 353 (App.Div.), certif. denied, 152 N.J. 189, 704 A.2d 19 (1997)("a determinative influence on the outcome"); cf. Taylor v. Metzger, 152 N.J. 490, 502, 706 A.2d 685 (1998)("The meaning of a racial epithet is often a critical, if not determinative, factor in establishing a hostile work environment."); see also Model Jury Charges (Civil), § 2.22C (2000)("discriminatory intent more likely than not motivated the employer's action").
Defendant itself argued in its written closing that plaintiff had to prove retaliation played "a part" in the decision to fire him. The judge found that "the fact that it was plaintiff who `blew the whistle' played a significant part in the decision to fire him." That finding satisfied the test set forth in Sisler that retaliation made a difference in the decision, 157 N.J. at 211, 723 A.2d 944, as well as the test set forth in Bowles and adopted by us in Kolb that "retaliatory discrimination was more likely than not a determinative factor in the decision." 320 N.J.Super. at 479, 727 A.2d 525 (citing Bowles, supra, 993 F.Supp. at 262).
In their closing arguments, each party discussed the testimony at length and stressed its own view of the credibility of the several witnesses. But both sides apparently agreed on plaintiff's burden of proof. According to plaintiff, "[t]o prevail under CEPA, [he] need only show that he suffered an adverse employment action motivated in part by retaliation for disclosing to a supervisor what he reasonably *273 believed to be a violation of the law." (emphasis added.) Defendant did not disagree, as noted above. In its written argument, defendant's sole reference to the applicable legal standard is the following: "The sole issue which the Court must now decide is whether ... Donofry has proven he was fired in contravention of ... CEPA, i.e., that he was fired, at least in part, in retaliation for making a disclosure to a supervisor or public body." (emphasis added). The doctrine of invited error bars a litigant from claiming on appeal that a position it advocated and that the judge adopted at trial was error. Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503, 677 A.2d 705 (1996).
Plaintiff's ultimate burden of proof is to prove by a preponderance of the evidence that his protected, whistleblowing activity was a determinative or substantial, motivating factor in defendant's decision to terminate his employmentthat it made a difference. Plaintiff need not prove that his whistleblowing activity was the only factor in the decision to fire him. Bergen Commercial Bank v. Sisler, supra, 157 N.J. at 211, 723 A.2d 944. The trial judge reached the conclusion that plaintiff's whistleblowing "played a significant part in the decision to fire him." That conclusion, which is supported by sufficient if not overwhelming credible evidence in the record, establishes that plaintiff met his burden of proof.
Defendant contends that plaintiff "deserved to be fired" for his violation of the Casino Control Act's licensing rules, "and he knew it." However, defendant admits, as it must because it did not fire Dhanoa and Rogers, that "violating the Act was not a firing offense per se." Defendant then argues that it had other "credible, well-supported reasons to fire Donofry while retaining Rogers and Dhanoa," specifically, poor supervisory performance in allowing the licensing violation to occur; a new and overlapping position of compliance officer, required by the CCC as a condition of its license, for which plaintiff lacked some qualifications; insufficient technical expertise to be able to take over the actual operation of the totalisator during a strike; and an excessively high salary. However, there is no evidence in the record that any of these theoretical grounds for firing plaintiff actually motivated Pierce[6]; certainly no one in the company ever gave plaintiff any of those reasons.
Defendant met its burden of production by offering some reasons for retaining Dhanoa and Rogers, who were equally if not more culpable in the licensing violation. In other words, defendant offered evidence to counter the inference of retaliatory motive arising from the disparate treatment of two culpable employees who did not blow the whistle on defendant and who were not fired. Nevertheless, the judge was not bound to accept defendant's explanation or to conclude that retaliation was not a motivating factor, and he apparently did not.
As we have shown, the overwhelming number of cases describing the burden of proof on a plaintiff such as Donofry describe that burden in terms of proving a substantial or determinative, motivating factor. In other words, a factor that made *274 a difference. The judge relied largely on circumstantial evidence to conclude that plaintiff's whistleblowing activity "played a significant part in the decision to fire him." We in turn conclude from those words that the judge found both reasons to be significant or substantial determinative, motivating factors that made a difference in the end result: plaintiff's termination.
Defendant now belatedly argues that plaintiff's burden was to prove "butfor" causation, that is, that he would not have been fired anyway for a lawful, nonretaliatory reason. Defendant cites Bowles v. City of Camden, 993 F.Supp. 255 (D.N.J.1998), for the proposition that in a case based on pretext theory, plaintiff has the burden of proving that he would not have been fired but for his whistleblowing activity (the retaliatory motive), whereas in a mixed motive case, defendant has the burden of proving that plaintiff would have been fired for some other, lawful reason, irrespective of his whistleblowing. Defendant contends that "[e]ither way, the dispositive element is whether the employee would have been fired anyway (the `butfor' test)." But defendant admits that it finds the "signal for the but-for test [in] the phrase `determinative factor,' as set forth in Bowles, 993 F.Supp. at 262."[7] While in many cases there will be little difference, we decline to require that the trial judge find any more than that retaliation was a motivating factor.
The burden of disproving but-for causation has been placed upon defendants in mixed motive cases, that is, when a plaintiff's proof of unlawful motive is sufficiently strong; the defendant then must prove that it would have taken the same action against the employee irrespective of the protected activity or status. See 42 U.S.C.A. § 2000e-2(m), as amended; Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); see also Zubi v. AT & T Corp., 219 F.3d 220, 224 (3d Cir.2000)(explaining the amendment to the Civil Rights Act of 1964 was intended to clarify that a plaintiff need only show that the unlawful factor "was a motivating factor" even though other factors were involved); Model Jury Charge (Civil), § 2.21, "Discriminatory Employment Practices" (2000).
Moreover, even if the "determinative, motivating factor" test is deemed synonymous with "but for" causation, we are satisfied that the judge's finding meets that test. The judge recognized that sacrificing an employee in an effort to show penitence for the violation would not itself be actionable, but went on to conclude that plaintiff's whistleblowing activity "more probably than not contributed to the decision to terminate him." Key to our conclusion is that the judge cited the disparate treatment of "the two others who equally share the blame for the unlicensed workers" and then concluded "[t]here had to be some element of retribution in the decision to fire only plaintiff...." With those explanations, we understand the trial judge's final conclusion that whistleblowing "played a significant part in the decision to fire him" to mean that plaintiff would not have been the one of the three employees to be sacrificed "but for" his protected activity.
We find no reason to reverse the judge's determination that defendant violated CEPA when it fired plaintiff.
[At the request of the court, those portions of the opinion addressing defendant's *275 challenge to the admission of plaintiff's expert witness's testimony respecting future lost wages and benefits and to the amount of the counsel fee award, as well as plaintiff's cross-appeal with respect to the counsel fee, have been excluded from publication.]
Affirmed.
NOTES
[1] Defendant Madeline E. Donofry's claims are derivative. We therefore refer to plaintiff Donald A. Donofry in the singular in this opinion.
[2] Plaintiff's original complaint included several other causes of action, all of which were dismissed either by summary judgment or at trial. Those dismissals are not the subject of this appeal. The amended complaint added a count under N.J.S.A. 5:12-80(g), which imposes a duty to report violations of the Casino Control Act upon "persons employed by a casino service industry" and prohibits discrimination against anyone who so informs. Neither the judge nor the parties address this statute or the question whether a private cause of action exists under this provision.
[3] There is no dispute that Donofry's communication to Sandson constituted protected reporting to a superior under N.J.S.A. 34:19-3(a).
[4] For a clear explanation of the difference between a pretext and a mixed motive case, see Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095-98 (3d Cir.1995).
[5] In its appellate brief, defendant argues that there were several other lawful reasons for plaintiff's firing, such as inefficient management by plaintiff and an excessively high salary in relation to his abilities. But no evidence was presented at the trial in support of those after-the-fact explanations.
[6] Defendant speculated in its written summation that plaintiff "could have been fired because he was overpaid relative to Brian Rogers and Sital Dhanoa; or simply because he would become dead wood in view of Autotote's agreement with the Casino Control Commission that it would hire a new compliance officer who would also have administrative duties at the Hub." But at trial, the only evidence of a non-actionable reason for firing Donofry was as a "scapegoat to the Commission."
[7] Bowles relies substantially upon Fuentes v. Perskie, 32 F.3d 759 (3d Cir.1994), where plaintiff's burden is described as prov[ing] "that the illegitimate factor was a determinative factor in the adverse employment decision, that is, that but for the protected characteristic...." Id. at 764; see also Starceski, 54 F.3d at 1095 n. 4.