**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1917-18T1

THOMAS BRODOWSKI,

 Plaintiff-Appellant,

v.

HUDSON COUNTY
COMMUNITY COLLEGE,
and DR. GLEN GABERT,

 Defendants-Respondents.

_____

> Argued on September 22, 2020 – Decided January 8, 2021
>
> Before Judges Gilson, Moynihan, and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2418-16.
>
> Deborah L. Mains argued the cause for appellant (Costello & Mains, LLC, attorneys; Deborah L. Mains, on the brief).
>
> Scott V. Heck argued the cause for respondents (Gordon Rees Scully Mansukhani, LLP, attorneys; Scott V. Heck, of counsel and on the brief).

PER CURIAM

Plaintiff Thomas Brodowski was suspended and, less than two months later, terminated from his position as vice president of administrative services at Hudson County Community College (the College) because, according to his employer, he used his College-supplied vehicle for personal use in violation of the College's code of ethics. He sued the College and its president, Dr. Glen Gabert, alleging they had violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. He appeals from the motion judge's order granting summary judgment to both defendants and dismissing his complaint with prejudice.

Our Supreme Court has recognized, "as remedial legislation, CEPA should be liberally construed." Lippman v. Ethicon, Inc., 222 N.J. 362, 381 (2015). Through that lens, we review de novo the evidence presented on a motion for summary judgment in the light most favorable to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536-37 (1995); Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 314 (App. Div. 2017), and affirm in part and reverse in part.

CEPA prohibits an employer from taking "any retaliatory action against an employee because the employee . . . [d]isclose[d] . . . to a supervisor . . . an activity, policy or practice of the employer . . . that the employee reasonably

A-1917-18T1

believe[d] . . . [was] in violation of a law, or a rule or regulation promulgated pursuant to law," N.J.S.A. 34:19-3(a)(1), or "[o]bject[ed] to, or refuse[d] to participate in any activity, policy or practice which the employee reasonably believe[d] [was] in violation of a law, or a rule or regulation promulgated pursuant to law," N.J.S.A. 34:19-3(c)(1).

To establish a prima facie claim under CEPA, a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule[] or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle[]blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle[]blowing activity and the adverse employment action.
>
> [Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003); see also Lippman, 222 N.J. at 380.]

Under the burden-shifting analysis applied to CEPA claims, "once [the] plaintiff establishes a prima facie case of retaliatory discharge, the defendant must then come forward and advance a legitimate reason for discharging [the]

plaintiff." Zappasodi v. State, Dep't of Corr., Riverfront State Prison, 335 N.J. Super. 83, 89 (App. Div. 2000). If a legitimate reason is proffered, the "plaintiff must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether[] the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999) (quoting Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998)).

Plaintiff alleged he performed a series of whistleblowing activities regarding: (1) a College employee, Joseph Torturelli, who allowed a custodial contractor to fraudulently bill the College for supplies and services in contravention of its contract with the College, and plaintiff's refusal to yield to pressure to rescind Torturelli's resignation; (2) the award of a project-management services contract to MAST Construction without bidding as required under Title 18A[1] or the failure to award that contract to the lowest bidder; and (3) fraud by faculty members overbilling the college.

The dismissal of plaintiff's complaint was the second time the motion judge had granted summary judgment to defendants. He first granted summary judgment finding plaintiff's admitted use of his College-supplied vehicle

---

[1] Public Schools Contracts Law, N.J.S.A. 18A:18A-1 to -60.

violated provisions set forth in the College Employee Handbook prohibiting the personal use of such vehicles and "was a legitimate, nonretaliatory reason for . . . plaintiff's ultimate termination." The judge determined none of the protected activities alleged by plaintiff was "a significant reason for the termination."

On plaintiff's motion, the judge thereafter reconsidered that ruling and reinstated plaintiff's complaint, finding Gabert's deposition testimony, taken two days prior to oral argument on the original summary judgment motion,[2] revealed new evidence that Gabert's personal use of his College-supplied vehicle was not, as he had stated, authorized by his contract with the College, thus creating disputed factual issues: whether plaintiff's personal use was also authorized and if defendants' reason for termination was a pretext.

Defendants moved for reconsideration of that order, arguing that even with the new evidence, plaintiff had failed to establish the prima facie elements of a CEPA claim. In a written decision the motion judge recapped that in his initial grant of summary judgment he had not found plaintiff's alleged whistleblowing activities were "significant reasons for termination[,] and that

---

[2] In his oral decision on plaintiff's motion for reconsideration, the judge stated Gabert's deposition was taken after the July 20, 2018 argument on the original motion. The deposition transcript provided in the record lists the date as July 18, 2018.

the termination was because of the unauthorized use of his vehicle." He noted that in his original decision, he had not found plaintiff established a prima facie case and instead considered evidence relating to the nondiscriminatory reason for termination. The judge said he "did not correctly apply the law relating to CEPA claims, specifically that the prima facie elements of CEPA must be met before [he] analyzes any legitimate non[]discriminatory reason for the termination." The judge also concluded evidence that Gabert "was not specifically given permission to drive his car for personal use . . . [did] not establish that a causal connection exist[ed] between the whistleblowing activity and the adverse employment action."

We review a grant of summary judgment using the same standard that governs the motion judge's decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018). Summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014); accord R. 4:46-2(c); see also Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017). "[C]onsidering the burden of persuasion at trial, the evidence submitted by the

parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party," Bhagat, 217 N.J. at 38; see also Grande, 230 N.J. at 24, we conclude there are genuine issues of material fact that should be submitted to the trier of fact.

In establishing that he or she reasonably believed there was a violation by the employer of "either a law, rule[] or regulation promulgated pursuant to law, or a clear mandate of public policy," Dzwonar, 177 N.J. at 462, a plaintiff is not required "to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred." Id. at 464. Whether the employee has identified a law or clear mandate of public policy is an issue of law for the court. Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187 (1998).

Inasmuch as it is not contested that plaintiff's suspension and subsequent termination were adverse employment actions, we focus on whether the evidence shows a genuine issue of material fact as to a causal connection between the protected activity and the adverse employment action. Our analysis compels an assessment of the totality of the circumstances that preceded defendants' decision to suspend then terminate plaintiff and a discrete review of

each of plaintiff's protected activities. Regan v. City of New Brunswick, 305 N.J. Super. 342, 345 (App. Div. 1997), abrogated on other grounds by Dzwonar, 177 N.J. 451.

Defendants vigorously dispute the evidence supporting plaintiff's alleged whistleblower activities, and they argue there is not any factual support for those allegations. We agree with those arguments as they relate to plaintiff's claimed whistleblowing of inaccurate faculty contracts but disagree as to plaintiff's other protected activities. Viewing the evidence favorably to plaintiff, the record facts establish a prima facie CEPA claim and a retaliatory termination sufficient to warrant denial of summary judgment as to claims related to the custodial and MAST contracts. We review that evidence.

Plaintiff alleged he learned Torturelli, without consulting the College's counsel, deviated from the terms of a contract with a custodial contractor that provided the contractor would bill by the hour and would provide custodial supplies. Instead, the contractor billed the College by square foot and charged the College for the supplies. Plaintiff reported the deviation to the College's chief financial officer, John Sommers, and requested he perform an audit. The audit found the College had been substantially overbilled. Plaintiff notified College counsel Sheri Siegelbaum of Torturelli's actions and contacted the then

director of human resources, Randi Miller, about further investigation of the alleged fraud on the College.

Torturelli took extended leaves from his job before resigning in June 2015. Gabert and College chairman of the board, William Netchert, pressured plaintiff to rescind Torturelli's resignation. Because of Torturelli's role in the fraudulent billing, plaintiff voiced his objection to their overtures to the College executive director of human resources, Vivyen Ray, as well as Gabert, Siegelbaum, Miller, Sommers and Veronica Zeichner, the College's chief financial officer.

Plaintiff does not allege anyone from the College, except Torturelli, had any role in the deviation from the contract terms that resulted in the overbilling to the College. In their merits brief, defendants argue plaintiff "did not even bother to look into who was responsible for the alleged billing error or address the fact that the person responsible for the billing error predated Torturelli." That not only signals the overbilling was a long-standing practice, but also provides evidential support for plaintiff's allegations. Further, Torturelli was the College director of facilities. And he was not charged by the College following the revelation. That the president and chairman of the board pressured plaintiff to rescind Torturelli's resignation provides evidence that plaintiff's employer countenanced the practices that resulted in the overbilling. Plaintiff

voiced objections to various College administrators, including Gabert, to the rescission of Torturelli's resignation because of his role in the overbilling.

Defendants assert Netchert denied exerting any pressure; or that the contract was never changed; or any overbilling may have been a mistake, not fraud; or Torturelli's resignation had nothing to do with the overbilling matter and the decision to reinstate him was not put to a vote; or employees other than Torturelli were responsible for the deviations. Those assertions, however, should not have been considered under the standards for deciding a summary judgment motion. Except for the contract not being changed—but deviated from—they are disputed facts, not considered in the light most favorable to plaintiff, and involve credibility determinations that must be made by the trier of fact.

Like defendants, we cannot reconcile plaintiff's claim that the College awarded a project-management contract to MAST Construction, whose president sat on the College's architectural advisory committee, without putting the contract out for bid with plaintiff's contention that he "attempted to select another company for a project, because that company had a lower bid." But the selection of MAST instead of the lowest bidder in contravention of N.J.S.A. 18A:18A-4(a)—combined with plaintiff's objection thereto, plaintiff's objection

10

to MAST's president sitting on the committee that chose the contractor, Netchert's insistence on MAST and Gabert's backing of MAST—evidences plaintiff's whistleblowing an activity he believed violated law and the law's underlying public policy. Whether, as defendants contend, plaintiff approved of MAST is, in light of plaintiff's contended objections, disputed evidence that cannot support the grant of summary judgment.

We agree, however, with defendants' argument that there is insufficient evidence to support plaintiff's whistleblowing activities with regard to alleged fraudulent practices by faculty. Unlike plaintiff's allegations about the two other protected activities, which are supported by evidence other than plaintiff's complaint and deposition testimony, we discern no other evidence to support his averment that he: reviewed all faculty contracts; "discovered" inaccuracies in approximately 130 of 470 contracts, and faculty members—particularly adjunct professors—"were getting paid more than they should have"; discovered adjunct professors "were putting in for compensation for work" for which they were not entitled to compensation; and submitted an audit report to Gabert and Ray.

But the evidence, notably plaintiff's deposition testimony, gainsays those allegations. Plaintiff testified "[s]omeone . . . came to [him] and showed [him] that an adjunct" was making what he thought was an exorbitant amount for

summer courses she was teaching. He later admitted in deposition that "someone," who he thought was an accountant who worked for the College finance department, actually went to her supervisor, Bob Cruz, not plaintiff. When asked if Cruz came to him, the following colloquy ensued:

> [Plaintiff:] Well, [Cruz] and Veronica [Zeichner] were looking at it and [Zeichner] came to me.
>
> [Defense counsel:] Okay. And what was the specific discussion about this particular teacher?
>
> [Plaintiff:] Well, it was really that she—the question I had asked is how can she make $34,000 for five weeks' worth of work?
>
> [Defense counsel:] And did anyone ever give you an answer?
>
> [Plaintiff:] Yes, they did. They looked at—they looked at the courses that she was teaching, and there was a list of courses in course development. There was an Excel spreadsheet put together and the courses that she was teaching that summer, as well as the other adjuncts.
>
> [Defense counsel:] Okay. And was her work for the college, did that justify a $34,000 stipend?
>
> [Plaintiff:] In my eyes, no, and in the CFO's eyes, no.
>
> [Defense counsel:] So with that being said that you didn't believe this teacher was entitled to $34,000, what was done with that information?

[Plaintiff:] That information was, basically, what we decided—we informed the vice president of [a]cademic [a]ffairs—

[Defense counsel:] Dr. [Eric] Friedman?

[Plaintiff:] —Dr. Friedman, and we also decided to go ahead and audit the fall contracts that were coming up.

It is clear plaintiff overstated his involvement which was tangential at best. As plaintiff admitted, Cruz and Zeichner "looked at" the $34,000 payment for the summer courses. His testimony that "we" informed Friedman and "we also decided to go ahead and audit the fall contracts" is not supported by any evidence. Tellingly, plaintiff admitted he did not know if the teacher was reprimanded, did not have any discussions about the issue with Friedman and never followed up with anyone about that issue.

As to the audit of the fall courses, plaintiff admitted at deposition that Seidman, using internal staff and a consultant, led the audit that revealed there were 130 contracts that were inaccurate. Plaintiff was told about the inaccuracies by the accountant from the finance department when he asked her, "[w]ell, how's the audit going?" Moreover, plaintiff admitted he never saw the spreadsheet setting forth the 130 inaccuracies. He said he "never was given the specifics on the 130 contracts" and "never saw the data." Plaintiff said the accountant did not tell him when the spreadsheet would be completed. In fact,

13                                                          A-1917-18T1

before he was suspended, plaintiff did not even know if it was ever completed and did not know if the audit was ever presented to Gabert. Plaintiff's allegation that he "submitted this audit report to both Gabert and Ray" is contradicted by his own testimony.

In his merits brief, plaintiff points to an email Friedman sent to him, contending Friedman told him "to be 'cautious' when auditing teachers' contracts." Although it does not help that plaintiff did not include in the record his email to which Friedman was evidently responding, the plain language of Friedman's email does not support plaintiff's contention. Friedman's caution related to the finance department acting without input from the academic affairs department: "This has to come from academic affairs and finance together. [Zeichner] and you should not clarify without academic affairs; it will be seen as finance running the show on its own and is problematic. Same ends can be achieved but I caution you about finance clarifying without [academic affairs]." Even if the email was addressing action related to the 130 contracts—which is not at all clear from the record—it does not convey the threat plaintiff alleges.

In fact, a close review of the record reveals the subject matter of that email concerned payments to faculty for unapproved "excessive overload" classes. The email's reference is to "STEM faculty concerns." Other emails contained

in the record bearing the same reference offer some insight into the subject matter. The initial email in the apparent chain from Friedman to Elizabeth Nesius, copied to Dean Christopher Wahl and Ray, relates that Wahl told Friedman "about certain faculty members not providing load sheets despite clear communications from [Nesius's] office. Additionally, there are some faculty with clearly excessive overload that [Nesius] was not given the opportunity, as the contract states, to agree to the additional classes." That email was forwarded by Ray to plaintiff and Zeichner later that afternoon with the message: "Not sure if you were already aware of upcoming 'overload' issues with [STEM]." Plaintiff later replied to Ray, Zeichner, Wahl, Nesius and Friedman: "If the sheets are not submitted, then [d]isciplinary action should occur and there is no guarantee going forward these stipends will be approved." Friedman then aired his view that the finance and academic affairs departments, with human resources, "need to be tied at the hip on this." He added, "[s]ubmitting load sheets with no time for an approval process has to change." In his reply, plaintiff suggested a meeting with STEM faculty, noting "[f]or someone [from that faculty] to question the request / contract requirement raises concerns. [Zeichner] and I will clarify for them what the process is now and going forward."

Plaintiff's deposition testimony clarifies the STEM faculty issue was separate from the contract inaccuracies that he advances as the whistleblowing activity. After testifying that he had conversations with Friedman about the inaccuracies in the contracts—both fall and summer—plaintiff added:

> And apparently, there was also an issue with contracts coming in late where we had adjuncts looking for payment, which were salary payments, but we had . . . nothing in the system for what they were teaching. So there were some discussions between . . . Friedman, . . . Wahl, another dean of the STEM program, I don't remember her name, and there was an [e]mail exchange about contracts not being in on time and contracts not being accurate, and also, that I was looking at contracts to making sure they were financially correct.

Plaintiff could not say if any "late contract . . . [w]ould fall into the category of [the] 130 inaccurate contracts" that formed the basis for one of plaintiff's whistleblowing activities. Although he said "[t]hey could be," while acknowledging he had never received any data about the 130 contracts, he clearly did not intend to include the "late" contracts as part of the activity related to the audited contracts.

A-1917-18T1

In that plaintiff's conflation of the emails and other evidence relating to the late contracts, including the anonymous letter left in the ladies' room,[3] offer no support for his whistleblowing activity relating to the audited contracts, we determine he did not establish he had engaged in a whistleblowing activity under

_____

[3] The letter is undated, but plaintiff claims in his merits brief that it was left "[l]ess than one week after [an] email exchange" on September 22 and 23, 2015. The letter provided:

> ENOUGH IS ENOUGH!
>
> It is time for . . . Gabert to step down. Who is really running this school? The president, the politicians, or [plaintiff]? [Plaintiff] purchased a $60,000 Chevy Tahoe for his personal use using college money. That's right, college money. How much more will faculty take? No money to address our low salaries, but the new VP gets a luxury car in addition to his high salary? All the while, his bullies are attacking faculty overload to save money??? What is wrong with this picture? Is this even legal?
>
> Where is . . . Gabert on this? Did he ok this? Is he even aware? Which one is worse?
>
> ENOUGH IS ENOUGH!

In his merits brief, plaintiff contends another anonymous letter was received in September 2015 by Gabert, "[a]fter [p]laintiff's audit," "complaining that the teachers' contracts were being audited" and that plaintiff "was driving the vehicle provided to him by [the College]." The letter was not provided in the record but, given that plaintiff played no real role in the audits, the vague, anonymous letter provides no support for plaintiff's argument.

N.J.S.A. 34:19-3(c). Overall, the weight of the evidence shows plaintiff's assertions are factually inaccurate or unsupportable. Summary judgment was properly granted as to that allegation. See Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999) (finding that "bare conclusory assertions in an answering affidavit," without factual support, "are insufficient to defeat a meritorious application for summary judgment").

As we have discussed, plaintiff's other allegations of whistleblowing activity are supported. As such, we conclude plaintiff met the first two prongs of CEPA with regard to his activities regarding the custodial and MAST contracts, but he did not establish a prima facie case as to the audited contracts.

We also deem plaintiff's suspension and termination to be an obvious adverse employment action. And there is sufficient evidence of a causal connection between plaintiff's whistleblowing activity and his termination to establish a prima facie case.

The causal connection element "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action. The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Maimone v. City of Atlantic City, 188

18

N.J. 221, 237 (2006).  "Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation.  Where the timing alone is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link."  Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (first quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); and then citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000)).

As we have determined, Friedman's September 2, 2015 email and the anonymous letters are not, contrary to plaintiff's merits-brief argument, evidence relevant to a whistleblowing activity; thus they do not support his causal-connection claim.  Although plaintiff's merits brief is woefully short of dates on which both remaining whistleblowing activities occurred, and the motion judge did not analyze this factor in any of his decisions, we are able to glean certain dates from the record.

Plaintiff was hired in January 2014, suspended on September 30, 2015 and terminated on November 25, 2015.  Thus, all activities occurred within a short span.  Plaintiff claims, beginning in July 2014, he objected to the presence of

MAST's president, Ted Domuracki, at meetings during which contracts his company stood to be awarded were discussed. Toturelli resigned in June 2015.

That Gabert knew of plaintiff's stance on Torturelli's involvement in the deviations to contract-payment terms for custodial services and materials, Torturelli's extended leave followed by his resignation and plaintiff's objection to Gabert's and Netchert's pressure to rescind Torturelli's resignation is circumstantial evidence linking plaintiff's termination to protected activity. So too, Domuracki's position on the advisory committee that played a role in the award of contracts to MAST and Netchert's desire to award contracts to that company also evidence a causal connection between that activity and plaintiff's termination. See Maimone, 188 N.J. at 239 ("[A] finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity.").

We do agree with the motion judge's determination during the first reconsideration motion that Gabert's personal use of his College vehicle called into question the reason plaintiff was terminated.

In a CEPA pretext case, a plaintiff may defend a summary judgment motion by presenting "some evidence, direct or circumstantial, from which a

A-1917-18T1

reasonable factfinder could conclude that defendants' proffered reasons [for its adverse employment action] were 'either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).'" Kolb, 320 N.J. Super. at 480 (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995)).

We recognized, in the context of Title VII[4] and New Jersey Law Against Discrimination (LAD)[5] cases, once a defendant proffers legitimate, nondiscriminatory reasons for its adverse employment action,

> plaintiff need not provide direct evidence that her employer acted for discriminatory reasons in order to survive summary judgment. "She need only point to sufficient evidence to support an inference that the employer did not act for its proffered non[]discriminatory reasons." Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 432 (App. Div. 1995). In other words, the plaintiff, as the non[-]moving party, "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies[] or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non[]discriminatory reasons.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).
>
> [Kolb, 320 N.J. Super. at 478.]

---

[4] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to -17.

[5] N.J.S.A. 10:5-1 to -49.

So too,

> [i]t is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim. It is also plain that the methods of proof and the applicable burdens in LAD and CEPA cases generally follow Title VII law, and we therefore frequently look to federal as well as state discrimination and retaliation cases as precedent.
>
> [Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 290 (App. Div. 2001) (citations omitted).]

Consistent with the burden-shifting process applied in Title VII and LAD cases, we held, once a defendant proffers legitimate, nonretaliatory reasons for an adverse employment action, a "plaintiff must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether, the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Kolb, 320 N.J. Super. at 479 (quoting Bowles, 993 F. Supp. at 262).

Plaintiff concedes that he brought his work vehicle home at night, but asserts that the director of security had told him he could bring the College vehicle home, the College did not have a written vehicle-use policy and Gabert also used his work vehicle for personal reasons. Plaintiff was suspended for personal use of the College vehicle. Gabert claimed the personal use of his

College vehicle was authorized by his employment agreement. As the motion judge noted, that was not the case, presenting a disputed fact regarding defendants' pretextual motive for terminating plaintiff. To be sure, there are many credibility issues with regard to the parties' contentions. But disputed facts should be decided by a jury; they should not form the basis for the grant of summary judgment. Brill, 142 N.J. at 540.

As such, we reverse and remand those portions of the motion granting summary judgment as to the claims based on whistleblowing activities regarding the custodial contract and the MAST contract. We remand both claims for further proceedings. We affirm the dismissal of plaintiff's claim regarding the contract audit.

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1917-18T1