**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4794-15T2

LISA R. EASLEY,

      Plaintiff-Respondent,

v.

THE NEW JERSEY
DEPARTMENT OF
CORRECTIONS,

      Defendant-Appellant.

_____

Argued October 2, 2018 – Decided July 17, 2019

Before Judges Fisher, Geiger and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0094-13.

Stephanie Cohen, Assistant Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Lisa A. Puglisi, Assistant Attorney General, of counsel; Stephanie Cohen, Assistant Attorney General, and Christie A. Pazdzierski, Deputy Attorney General, on the briefs).

Alan H. Schorr argued the cause for respondent (Schorr & Associates, PC, attorneys; Alan H. Schorr and Arykah Trabosh, on the brief).

PER CURIAM

Defendant New Jersey Department of Corrections (DOC) appeals from a Law Division judgment awarding compensatory and punitive damages, enhanced attorney's fees, costs, back pay, compensation for negative tax consequences resulting from the economic damages awarded, job reinstatement, prejudgment interest, and other relief after a jury found the DOC retaliated against plaintiff Lisa Easley in violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.

Plaintiff was removed from her at-will position of assistant superintendent, and subsequently removed from her former civil service position of correction sergeant, after an investigation revealed she: (1) paid Lydell B. Sherrer, then Deputy Commissioner of the DOC, $7500 for her position; (2) admitted to paying and loaning Sherrer additional monies; and (3) solicited bribery payments from at least two other DOC employees on behalf of Sherrer.

Following an FBI investigation, a federal grand jury issued a twelve count indictment charging Sherrer with attempt to extort under color of official right, 18 U.S.C. § 1951(a) (counts one through six), and bribery, 18 U.S.C. §

666(a)(1)(B) (counts seven through twelve). The indictment also contained a forfeiture allegation seeking forfeiture of any property that constituted or was derived from proceeds traceable to the commission of the offenses.

Sherrer entered into a plea agreement. He pleaded guilty to a single count of extortion under color of official right, in connection with his official duties with the DOC as Deputy Commissioner and Assistant Commissioner, in exchange for dismissal of the remaining eleven counts. According to the plea agreement, Sherrer solicited bribes totaling $69,000 from eight individuals, and received a total of $36,500 in bribes from six of those individuals, including $10,500 from plaintiff during 2006, 2007, and 2008. It also states that "during the time of the offense," Sherrer "was a public official in a high-level decision-making position."

On January 3, 2012, Sherrer was sentenced by a federal district court to a forty-six-month prison term, followed by three years of supervised release, ordered to make restitution totaling $22,500, and forfeited $7000 to the government. Plaintiff was identified in the judgment of conviction as one of the two victims to receive restitution. Sherrer was ordered to make restitution in the amount of $12,500 to plaintiff.

3

The DOC suspended plaintiff without pay and subsequently removed her effective January 30, 2012. Plaintiff filed this action alleging the DOC violated CEPA by terminating her in retaliation for whistleblowing (count one) and wrongfully terminating her in violation of public policy (count two).

Plaintiff alleged she was extorted by Sherrer beginning in 2008. She claimed Sherrer collected $12,500 in extorted payments and received an additional $17,000 in loans from plaintiff that were never paid back. She further claimed Sherrer "extorted" her to obtain money for Sherrer from her family members. In 2010, FBI and DOC investigators went to plaintiff's residence to question her about extortion and bribery involving Sherrer. On October 10, 2010, Sherrer was arrested and charged with two counts of bribery. In June 2011, plaintiff testified before a federal grand jury regarding Sherrer's extortion and bribery scheme.

In December 2011, plaintiff was approached by members of the DOC's Special Investigations Division (SID) for an interview regarding her involvement in Sherrer's extortion and bribery scheme. Plaintiff cooperated and participated in the interview, which focused on payments made to Sherrer.

On January 4, 2012, plaintiff was advised she was being demoted from her at-will position of Assistant Superintendent I to Correction Sergeant

4

effective January 14, 2012. On January 14, 2012, plaintiff was charged with three disciplinary offenses and suspended without pay pending removal. Following an informal hearing, the disciplinary charges were sustained and plaintiff was removed effective January 30, 2012. Plaintiff subsequently filed this action rather than pursuing her appeal of the removal.

Plaintiff claims the DOC retaliated against her for cooperating with the FBI investigation and testifying before the grand jury regarding the charges brought against Sherrer. Following discovery, summary judgment motion practice, and a multi-week trial, the jury found in favor of plaintiff and awarded her compensatory damages, including $1,000,000 for emotional distress, and $6,500,000 in punitive damages. The trial judge ordered additional legal and equitable relief, including reinstatement and enhanced attorney's fees and costs.

The DOC claims several trial errors. First, it argues the CEPA claim should not have been submitted to the jury because plaintiff failed to establish a prima facie case. The DOC maintains, among other things, that plaintiff was not a whistleblower because she did not come forward voluntarily, but merely cooperated in the investigation after the FBI came to her and subpoenaed her to testify before the grand jury.

The DOC also claims a number of evidentiary issues mandate a new trial. Over the DOC's objection, plaintiff was permitted to introduce Sherrer's federal indictment, plea agreement, and judgment of conviction as evidence. These documents, along with plaintiff's testimony regarding a letter she received from a federal prison warden, identified plaintiff as a "victim" who was entitled to restitution from Sherrer. The documents were admitted into evidence as official public records and by the trial court taking judicial notice. In so doing, the court did not address the imbedded identification of plaintiff as a victim and her right to restitution from Sherrer. Because these documents improperly bolstered the plaintiff's position and usurped the jury's exclusive role to decide this critical factual issue – namely, whether plaintiff was a victim of Sherrer's criminal actions or a voluntary participant and beneficiary of the scheme, who for several years failed to report Sherrer's extortion and bribery to authorities until she was interviewed by the FBI – the documents were manifestly prejudicial.

The DOC further claims the trial court erred by permitting plaintiff to improperly and unnecessarily refresh the recollection of a witness by playing a lengthy audiotape before the jury. The DOC asserts the tape contained prejudicial hearsay statements that were not relevant regarding alleged other bad acts by Sherrer, who was not a party in the case.

6

Considered separately or collectively, the prejudicial impact of the improperly admitted evidence undermined the reliability of the resulting verdict. We reverse and remand for a new trial.

I.

On January 10, 2013, plaintiff filed a complaint against the DOC alleging retaliatory termination in violation of CEPA and wrongful termination in violation of public policy. The trial court denied the DOC's motion for summary judgment.[1] Plaintiff voluntarily dismissed her claim for wrongful termination in violation of public policy prior to trial.

Following discovery, the case proceeded to a multi-week jury trial beginning in September 2015. The jury heard evidence that plaintiff, age forty-nine at the time of the trial, began her career as a corrections officer in February 1996. The DOC is a "paramilitary" organization with clear lines of responsibility among officers. Corrections officers must complete a fourteen-week training academy and are sworn law enforcement officers. They take an oath "to uphold the standards and regulations of the [DOC]" and to "faithfully . . . discharge the duties of the title to the best of [their] ability."

---

[1] The DOC does not appeal from the denial of its motion for summary judgment.

The DOC follows a clear chain of command. The Commissioner is the highest-ranking official, followed by the Deputy Commissioner. Below that, in ascending order, the chain of command is corrections officer, sergeant, lieutenant, captain, chief, assistant superintendent, associate administrator, and administrator.

Plaintiff was promoted to senior correction officer approximately one year after she started. In 2002, she was promoted to sergeant and was assigned to Northern State Prison (Northern) where Sherrer was the Administrator. Plaintiff testified Sherrer was in command at Northern when she worked there and "could pretty much do what he wanted." Sherrer told plaintiff she should not listen to her commanding officers, specifically the chief who told her something different than Sherrer, but she "had to listen directly to him" because "he could promise [she] would have a job."

Plaintiff became Assistant Superintendent at Garden State Youth Correctional Facility in 2009. The assistant superintendent is the third-highest ranking official at the facility. Sherrer was able to orchestrate plaintiff's promotion to the assistant superintendent position despite her lack of qualifications and poor performance during her interview for the position.

A-4794-15T2

While at Northern, plaintiff became friends with Sherrer, who served as administrator there until 2006. Sherrer was later promoted to Deputy Commissioner. From 2006 to 2010, plaintiff made a series of payments to Sherrer to procure various assignments and promotions. These included $500 paid to Sherrer in 2006 for a shift assignment, $2500 paid in 2007 for a position in the DOC's Special Operations Group, and $7500 paid in September 2008 for the assistant superintendent position. Plaintiff confirmed the terms of the deal in an email to Sherrer:

> Just got [your] message [to call] me when [you] get a chance. [You] said the deal [we] made [would] take care of everything including having me well prepared, that we [would] sit down and [you would] go over all the questions and answers and it [would ] be a breeze[.] I [would] have no problems, that's what [you] promised. Don't change up. Is there [something] else coming soon?

The DOC was not aware of these payments until Sherrer was arrested in 2010.

Sherrer helped plaintiff prepare for the assistant superintendent interview. Plaintiff met with Sherrer in his car to help her prepare her answers to interview questions. He offered to provide the confidential interview questions in advance for an additional $600. Sherrer gave plaintiff the confidential interview questions even though she did not pay him the additional $600. Plaintiff was selected for the position, resulting in a $6000 salary increase.

9

In Sherrer's own words, plaintiff's participation in the scheme made her "a part of" his "inner circle." Her misconduct did not stop at making payments to Sherrer to obtain benefits for herself. Plaintiff also collected payments for Sherrer from two other DOC employees who were receiving similar benefits from him.

In 2008, plaintiff facilitated and collected a $2500 bribe from Lieutenant Lance Collins on behalf of Sherrer. When Collins did not obtain the new position, plaintiff withdrew $2500 from her personal account and gave the $2500 back to Collins.

Plaintiff also collected a $5000 check from her cousin Juanita Miller, for Sherrer's assistance in receiving a high score on the Civil Service test for lieutenant, so she could receive a promotion. Plaintiff deposited the check in her own account, but returned the money to Miller because she did not receive a high score.

Collins and Miller were in the process of retiring by the time the FBI arrested Sherrer and interviewed plaintiff. They retired before the DOC received clearance from the FBI to proceed with disciplinary actions against them.

Gary Lanigan became Commissioner of the DOC in May 2010. Plaintiff served as the Assistant Superintendent of the Division of Operations. Lanigan

demoted Sherrer from Deputy Commissioner to Assistant Commissioner of Programs in May 2010. Upon being demoted, Sherrer was no longer in plaintiff's chain of command. Instead, plaintiff "would have reported up to the assistant commissioner for Programs." Even though Sherrer was no longer in plaintiff's chain of command, she remained silent about Sherrer's unlawful behavior. She could have reported his misconduct to the Commissioner, Deputy Commissioner, Assistant Commissioner of Programs, SID, superintendent at the facility, a union representative, the State Police, the County Prosecutor, or other law enforcement agencies. She did not.

The DOC posted notices in its facilities informing employees of their rights and the requirement to report retaliatory actions in order to receive protection under CEPA, pursuant to N.J.S.A. 34:19-7. The notice identifies Leila Lawrence as the designated contact person to receive written notifications pursuant to N.J.S.A. 34:19-4. It also provides her telephone number. Plaintiff did not notify Lawrence of Sherrer's conduct. As a result, the DOC was not afforded the opportunity to investigate Sherrer's conduct and remediate any alleged unlawful conduct.

Sherrer was arrested and charged with two counts of bribery by the FBI on October 12, 2010. Sherrer was removed from employment as a result of the charges.

Plaintiff learned of Sherrer's arrest on the day it happened. Plaintiff was "relieved" when she learned of Sherrer's arrest. Even after Sherrer's arrest, plaintiff remained silent until FBI and SID agents traveled to her residence to interview her. Plaintiff testified she "never thought about" complaining to the FBI about Sherrer's conduct until the FBI appeared at her doorstep on October 14, 2010. Plaintiff claimed she was still fearful of the powerful people Sherrer knew and because Sherrer put Kevin Bolden in charge of SID after Bolden paid for the position. Plaintiff also claimed she did not report Sherrer to Lanigan because Lanigan "made it seem like" he was friends with Sherrer, even though she knew Lanigan demoted Sherrer.

Plaintiff did not come forward with information regarding Sherrer until the FBI arrived at her home on October 14, 2010. Plaintiff agreed to cooperate in the investigation and testified she told the FBI "everything" from the beginning and named six or seven people involved. She claims she did not mention Bolden because he was connected to SID.

During the interview, plaintiff admitted paying Sherrer $7500 to be promoted to Assistant Superintendent. She also admitted to collecting money from Collins and Miller for Sherrer. Plaintiff told the FBI she was concerned she would have difficulty being promoted, transferred, or obtaining desirable duty assignments, days off, and work schedules if she did not pay Sherrer the money he requested. Despite such concerns, plaintiff stated that on two or three occasions she did not accede to Sherrer's demands for payment. Sherrer did not take any actions to interfere with her employment when she refused to pay him.

Plaintiff met with Special Agents Arthur E. Durrant and Richard Nowaczek from the FBI a day or two later and gave the same names; SID investigators Edward Soltys and Joseph Moore were also present during the interview. Plaintiff asked if she needed union representation but the investigators said they were there to "protect" her so she answered the FBI's questions, including stating that "somebody" in SID was involved. Plaintiff claimed she was told not to tell anyone about the investigation, including her family and colleagues at the DOC.

Plaintiff met again with Durrant and Robert J. Sica from the FBI, along with Soltys and Moore from the SID, on October 26, 2010. She repeated the names of people Sherrer accepted bribes from. Plaintiff also mentioned Sherrer

A-4794-15T2

told her Tom Moran paid Governor Corzine $25,000 to get the chief of staff position. Because SID investigators were present at the meeting, plaintiff believed she was essentially "giving this report" to the Commissioner.

Plaintiff met with the FBI four times between March 25 and April 6, 2011. At the FBI's request, plaintiff wore a wire and recorded Bussey admitting to paying money to Sherrer. They asked her to record Collins because he had denied the allegations. After attempts to reach him by phone were unsuccessful, plaintiff wore a wire and recorded Collins's admission to paying the bribe to Sherrer.

In April 2011, plaintiff met twice with the FBI and an Assistant United States Attorney to prepare for her grand jury testimony. She was subpoenaed and later testified before the grand jury and told them "everything [she] knew." On September 30, 2011, the FBI met with plaintiff to review emails plaintiff exchanged with Sherrer.

On October 4, 2011, plaintiff went out on medical leave to have surgery and submitted a retirement application for her pension effective April 1, 2012. A November 2011 Retirement Inquiry Checklist to be completed by the employer asked whether plaintiff was the subject of a DOC investigation or complaint that may result in disciplinary action or criminal charges. The

Administrator, SID, the Office of Employer Relations, the Equal Employment Division (EED), and the Ethics Office all answered no to that question, and her pension was approved by the Bureau of Retirement.

Plaintiff met with Soltys and Moore again on December 14, 2011, two days after receiving her retirement approval letter. Plaintiff recorded the conversation and Soltys's statements that the meeting was "just a formality," that nothing she said would be used against her, and that she did not need an attorney or union representation. Plaintiff was terminated without warning about a month later. She claims she suffered emotional distress and contemplated suicide because she lost medical insurance benefits when she needed surgery.

Plaintiff testified that if she had received the required notice from pensions that she would not receive her pension if she was found guilty of any misconduct, she would never have agreed to the interview with SID without an attorney present. She said "they tricked me."

During the December 14, 2011 interview by SID, plaintiff stated she became "closely acquainted" with Sherrer in 2002 while she was at Northern. Before she was promoted to Assistant Superintendent, Sherrer talked to plaintiff about the position and she declined Sherrer's offer. Sherrer then left her a voice mail saying it would be in her "best interest to take this position." She denied

15

any kind of "fraterniz[ation]" with Sherrer and in hindsight described their relationship as "probably more of a manipulative type of . . . relationship." Plaintiff claimed she had not previously expressed any interest in working in administration.

In a series of recorded voicemails and emails between August and December 2008, Sherrer solicited $7500 from plaintiff for the new position and told her it was in her best interest to apply. Sherrer also left instructions on her voicemail for plaintiff to contact him when she reached a deal with Collins and when he wanted more money from her for the assistant superintendent position.

As to the payment, plaintiff first said she wrote him a check and gave it to him at the central office where she was working at the time. She then said she gave him cash. Sherrer told her she would be interviewed and gave her the questions in advance so she would be "well prepared." Possibly in December 2008, Sherrer came back to plaintiff and said he had to "work a little harder" to get her the position and he asked for more money. Plaintiff was unsure, but she thought he asked for $500 or $600 for the interview questions and then another $1500 after the interview. She refused to give him more money beyond the original $7500 and he eventually gave her the questions anyway. Plaintiff said

Sherrer called her the first week in January 2009 to tell her she got the assistant superintendent job and was going to Garden State.

Plaintiff loaned Sherrer $17,000, but he "got caught" before he could repay her. When asked about the emails from 2010, plaintiff claimed that she was just trying to get her money back.

Plaintiff said Sherrer had her "facilitate" transactions with other employees. First, Collins mentioned he knew people were getting promoted because "they paid [Sherrer] or somebody else" and Sherrer had plaintiff ask Collins if he would be "interested" in paying for the job. Collins agreed and Sherrer told him the lateral transfer would cost $2500. Collins gave the money to plaintiff sometime in 2008 and plaintiff gave it to Sherrer. Collins did not get the job and wanted his money back. Sherrer attempted to convince Collins to apply for another position but it took too long. Plaintiff ended up paying Collins back with Sherrer promising to reimburse her.

Plaintiff then described how Miller, her cousin, asked about getting a promotion or other jobs some time in 2009 but "nothing came of it." Miller gave plaintiff $5000 to give to Sherrer. Sherrer "guaranteed" Miller would pass the lieutenant's test, but she failed. Plaintiff believed Sherrer "had someone at Civil Service" who would provide answers or correct their answers because he had

offered that to her before and there were people who were "sergeants forever and didn't make it, but all of a sudden they come up top."

Plaintiff denied facilitating transactions for anyone other than Collins and Miller, both of whom were retired by the time she spoke to the FBI about them. She confirmed she was "fully cooperating with an outside agency in this matter" and she gave them the same information. When asked if she ever thought about refusing Sherrer, plaintiff said she did not know who to report it to because Sherrer was politically connected and she feared retaliation because "he made it clear that, you know, he could end my career."

The FBI advised SID that plaintiff paid Sherrer for the Assistant Superintendent position. Following completion of the FBI investigation, SID conducted an internal affairs investigation, which included interviewing plaintiff. The DOC contends that, based on the results of the SID interview and investigation, plaintiff was removed from her at-will position as assistant superintendent and returned to her former position as Correction Sergeant effective January 14, 2012. Because of plaintiff's pending application for retirement on April 1, 2012, the DOC notified the pension Board of Trustees that plaintiff was suspended with pay pending the investigation and the return to her previous title.

The DOC issued a Preliminary Notice of Disciplinary Action on January 17, 2012, charging plaintiff with: conduct unbecoming a public employee; engaging in financial transactions between employees; violation of a rule, regulation, policy, order, procedure, or administrative decision; and other sufficient cause. The charges were based on the SID report revealing plaintiff "admitted to paying a $7500 bribe" to Sherrer "to obtain the position of Assistant Superintendent," "admitted to loaning Sherrer additional large sums of money," and "admitted collecting bribes from two other former staff members in anticipation of them receiving benefits such as a transfer and receiving a high score on a [Civil Service Commission] exam." The notice stated removal as the disciplinary action that may be taken.

Plaintiff attended the departmental hearing with her attorney, but based on her attorney's advice, she did not present witnesses or evidence in her defense. Plaintiff admitted she paid Sherrer for the position of assistant superintendent. In a decision dated January 18, 2012, a DOC designee determined plaintiff "violated established rules and regulations of the Department" and suspended her without pay. Plaintiff appealed.

A disciplinary appeal proceeding was conducted by a hearing officer on January 27, 2012. The SID investigation report and the transcript of plaintiff's

SID interview were admitted into evidence at the hearing. Soltys testified for the DOC. He stated that a cooperative investigation between the FBI and SID revealed plaintiff paid Sherrer to secure a promotion to the title of Assistant Superintendent. During her interview on December 14, 2011, plaintiff admitted to paying Sherrer $7500 in exchange for her promotion to Assistant Superintendent. Easley also said she loaned Sherrer funds ranging from $500 to $17,000 that were not paid back. Easley reported she was aware Sherrer was receiving money in return for granting positions within the DOC and that she assisted Sherrer, at his request, by collecting bribes from two employees whom Sherrer promised transfers and high scores on a civil service exam. Soltys confirmed SID was not involved in the investigation until after Sherrer's arrest.

Plaintiff did not testify or present any witnesses or evidence at the hearing. The hearing officer sustained the charges and penalty of removal, finding the DOC proved by a preponderance of the evidence that plaintiff "displayed conduct unbecoming an employee when she engaged in financial transactions between employees," by paying a bribe for a promotion and collecting and transporting funds from two former staff members in exchange for benefits. The hearing officer's report was admitted into evidence at trial.

A-4794-15T2

Plaintiff initially appealed the decision to the Office of Administrative Law (OAL), but, on the advice of her attorney, she withdrew the appeal and filed this action in the Superior Court. Plaintiff withdrew her pension application pending the outcome of her lawsuit.

Plaintiff testified no one else was disciplined for paying money or even interviewed by SID and there was no investigation by the DOC as to the "kickbacks being paid by or to other people." She believed she was "singled out" because she "named names" and "the Department was embarrassed that this extortion was going on and that people would find out and they wanted somebody to be punished for it." She claimed that she only learned "later on" that Conway and Sapp had been cooperating with the FBI in a "sting to gather information against Lydell Sherrer" and that they were the ones who "blew the whistle" on Sherrer.

Prior to trial, the DOC filed a motion in limine to bar: (1) the admission of documents from the federal district court, the Federal Bureau of Prisons, or other federal source that referred to plaintiff as a "victim" of Sherrer's scheme, and (2) any testimony or argument that plaintiff was a victim. Over the DOC's hearsay and relevance objections, the trial court permitted plaintiff to introduce testimony and move into evidence Sherrer's federal indictment, plea agreement,

judgment of conviction, and a letter from the Department of Justice that referred to plaintiff as a "victim."

Plaintiff also testified she was unfairly targeted by the DOC since other DOC employees involved in Sherrer's scheme were not disciplined or terminated. To support that allegation, plaintiff was permitted to testify Sherrer told her other DOC employees paid for favors, despite plaintiff having no independent knowledge of such conduct. This included Bolden, who was not identified by either Sherrer or plaintiff during the FBI investigation or SID interview. The trial court admitted this testimony under Rule 803(b) as substantive evidence of admissions by a party-opponent. N.J.R.E. 803(b).

Plaintiff called Lanigan as a witness. Lanigan was appointed Commissioner in January 2010. He testified he did not know Sherrer before his nomination as Commissioner. He began meeting with Sherrer during the three weeks before his senate confirmation hearing. He had not yet heard Sherrer's nickname, "Lying Lydell," and believed at that point that Sherrer was "a long-serving civil servant" who "had risen through the ranks to deputy commissioner."

Before his confirmation hearing, Lanigan met with Senator Gerald Cardinale, who said he thought "Sherrer was dishonest or deceptive during a

hearing concerning the removal of Riverfront Correctional Facility from the inventory of the [DOC]." Sherrer had testified there were sufficient beds and overcrowding would not be an issue with the removal of that facility. Senator Cardinale told Lanigan Sherrer misled them. Lanigan asked SID to investigate, but did not recall if this was before or after his confirmation hearing.

Lanigan was questioned as to the details of the SID report and whether Sherrer's testimony was an exaggeration or misleading, but he maintained the investigator's conclusion that "there appears to be no information available at this time to substantiate that Mr. Sherrer intentionally provided false information to the State House Commission." He believed Sherrer did not lie to the Commission and testified "history proves, in fact, that [Sherrer] was correct, because they did close and vacate the facility and they did properly house the inmates."

When asked if he told Senator Cardinale at his confirmation hearing that he had looked into the issue and that Sherrer had been telling the truth, Lanigan said he had "determined that there was nothing at that point in time that led [him] to believe that Mr. Sherrer was less than honest with the [S]enator." Over the DOC's objection, plaintiff was permitted to play a twenty-minute tape of the hearing, before the jury, to refresh Lanigan's recollection. Plaintiff used the

recording to attack Lanigan's credibility even though the Senate hearing occurred long before Sherrer's arrest and was unrelated to Sherrer's bribery scheme or plaintiff's discipline.

Lanigan testified Sherrer was demoted to assistant commissioner before he received the outcome of the SID investigation, but after the confirmation hearing and his discussions with the senator. Lanigan maintained that moving Sherrer from deputy commissioner to assistant commissioner was a demotion, even though the paperwork did not check the box marked demotion and Sherrer's salary did not change. He said he demoted Sherrer because he wanted to appoint people who he was "familiar with and trusted" to the top three positions.

Lanigan learned of Sherrer's arrest about two hours before the FBI held a press conference. When asked what steps he took to "investigate or understand how widespread this corruption was," Lanigan said that he "would have called" the chief investigator into his office to advise him to cooperate fully and request a joint investigation. Lanigan believed the FBI would investigate DOC upper management and he "had no reason to believe" that "SID itself was crooked or doing anything that was unlawful."

Lanigan testified the confidentiality agreement he signed with the FBI on December 2, 2010, prohibited him from passing along information to others

about the investigation, including their own HR department, and prohibited the DOC from doing its own investigation of Sherrer or interviewing people about Sherrer without permission. He first claimed the FBI also did not permit the DOC to bring administrative actions against any employees connected with Sherrer at that time so that it would not interfere with their investigation, but later testified he did not know if the letter "per se prohibited it."

Lanigan received verbal updates on the Sherrer investigation as it progressed and a three-page report from SID about plaintiff at the end of the investigation. Lanigan testified he directed SID to "conduct a joint investigation with the FBI of the issues surrounding Lydell Sherrer, which would have included Ms. Easley." He did not recall if plaintiff's name was the only name given to him by SID, but he testified plaintiff "was a byproduct" of the investigation of Sherrer.

Lanigan was told plaintiff was cooperating with the FBI and "they believed that she was being truthful with the FBI." However, he said she "only" cooperated after the FBI went to her; she did not go to the FBI. Lanigan was not sure whether he directed plaintiff be disciplined before or after the FBI investigation was completed, but he testified it was "increasingly clear" to him plaintiff had to be removed from her position as the "third highest in the facility"

25

because she "was fully complicit in the actions of Lydell Sherrer." He denied any intention to retaliate against plaintiff because she testified before the grand jury or cooperated with the FBI because he felt it was her responsibility to cooperate. He also denied directing Bolden to investigate plaintiff because she applied for her pension.

Lanigan testified he learned from SID that plaintiff "acted as a go-between between persons that Mr. Sherrer was offering jobs for money to and collecting the money from them, approaching them, delivering money to Mr. Sherrer, [and] that there were also financial transactions that she had conducted with Mr. Sherrer, including her own promotion." Lanigan testified he was not certain if he was told plaintiff and Sherrer were friends and he was not told plaintiff claimed she was threatened by Sherrer, but he maintained it was not a "significant fact" and would not have changed his opinion that plaintiff was complicit.

Lanigan decided to remove plaintiff from her at-will position before he received the SID report. It was his decision alone to remove her. He said he had "no reason to believe" the report was not truthful. He testified plaintiff was restored to her civil service position as a sergeant and it was then Green's job, as director of employee relations, to impose discipline. Although he was

authorized to overrule Green's recommendation to terminate plaintiff, he chose not to because he agreed plaintiff violated her oath and should be terminated.

Lanigan testified plaintiff was obligated to report Sherrer's conduct and she had "many options" on where to report the activity, including SID, the ombudsman, the prosecutor, and the police. He was aware that the federal court "declared Ms. Easley to be a victim of extortion" and that she paid back money from her own pocket to one of the people Sherrer had her collect money from. In response to a question asking whether he should be "apologizing to your victims rather than firing them," Lanigan responded "[w]hen a victim becomes a perpetrator, I will not apologize." He believed plaintiff "was involved in criminal activity" "[a]s a perpetrator as well as a victim."

When asked why he did not go after "all the other victims," only plaintiff, Lanigan responded:

> there is a very big distinction between an assistant superintendent and a lower subordinate, a correction officer or a lower subordinate. The assistant superintendent is . . . the third highest ranking position in that facility, so there is a huge difference between her and others. That is why I was more familiar with what took place with Ms. Easley than with other individuals because I felt that I had a responsibility for the managers in the department to be held to a proper standard. . . .

> . . . I did not fire Ms. Easley. I took Ms. Easley and restored her to her last civil service rank where she had the same rights or the rights of her contract, disciplinary rights, as the other individuals would have if charges were brought against them.

He explained that the "higher the rank the more dangerous it is" to have a "compromised law enforcement officer" and plaintiff was "in a very different status than anybody else that [he was] aware of." Yet he testified "[s]he would have gone through the same disciplinary process as any other officer would have." When questioned why the DOC did not discipline any of the other fifteen alleged victims of Sherrer's extortion, Lanigan responded he did not know there were that many or why they were not disciplined. Notably, plaintiff does not claim any other DOC supervisor was aware of Sherrer's extortion or bribery prior to the FBI investigation.

After plaintiff rested, the DOC moved for a directed verdict pursuant to Rule 4:37-2(b). The trial court denied the motion. The DOC called Green as its only witness.

Green served as Assistant Director of the Office of Employee Relations from 2004 to 2007, and was Director of the EED from 2007 until he left the DOC in 2014. As EED Director, he was responsible for the administration of

28

all major discipline involving suspension of six days or more. Although he was a lawyer, he was not permitted to function in that capacity.

Green testified he learned of Sherrer's arrest on the day of the arrest. He said he was unaware Sherrer accepted bribes from DOC employees in exchange for positions or other benefits. He knew Sherrer's nickname was "Lying Lydell" and that Sherrer lied to him "several times" "to try to protect employees from discipline." Green testified Sherrer "disgraced himself." Green maintained that he considered anyone who paid Sherrer money a "criminal," but did not have the authority or all the information to find out who else was involved or file discipline against others until after the FBI investigation was complete.

Green recommended to the Commissioner that plaintiff be removed from her at-will position as assistant superintendent and he later "authorized and oversaw her removal from employment as a corrections sergeant." He testified the decision was his own and was not discussed with Lanigan or anyone outside of EED. On cross-examination, Green claimed he first heard plaintiff's name sometime in November 2012, about forty-two days before he brought the charges against her. The unnamed "high-ranking official," who advised Green plaintiff was "involved in the Sherrer matter," did not name any other participants.

Green said the factual basis for the disciplinary charges against plaintiff was her admissions "she had, in essence, purchased her current position" for $7500; that she "participated in the sharing and lending of money related to conduct not consistent with a law enforcement officer;" and that she "otherwise assisted Mr. Sherrer in his despicable conduct to bring dishonor to the Department of Corrections." He did not know plaintiff once went to the EEO to complain about Sherrer and agreed it was a violation of the rules for the EEO officer to then tell Sherrer of her report.

Green used the SID report about Sherrer and plaintiff in his decision to charge plaintiff. He chose not to review the tape of the FBI interview. The SID report was where Green first learned of the involvement of Miller and Collins.

Green explained the charges levied against plaintiff included "conduct unbecoming," the charge used for conduct of a sworn law enforcement officer or state employee "in direct contravention to their duties and responsibilities." He determined plaintiff's conduct in purchasing a job, "which is generally considered an illegal act," violated her duty as a law enforcement officer.

The second charge was engaging in financial transactions, which dealt with the prohibition on loans, sharing money, and related activities between employees. Green testified the charge was filed against plaintiff because "there

30

were financial transactions that were in furtherance of a conduct unbecoming scheme, a conduct that was deemed at least in part by one of the actions to be criminal and landing them in jail." The conduct included plaintiff loaning Sherrer "large sums of money."

The third charge was for violation of a rule, policy, or procedure, which was in line with the "general rules concerning law enforcement . . . to obey the law and to not participate in the breaking of the law." Green testified there was sufficient evidence to charge plaintiff because she admitted to purchasing her position.

Based on these charges, Green recommended removal because law enforcement officers take an oath "to uphold the law." He concluded plaintiff "brought dishonor" to the DOC and "forfeited the right to have a badge" by engaging in her admitted conduct in purchasing her job and assisting in collecting bribes from other employees. Green "didn't care that she had cooperated with the FBI" and said "[h]er cooperation came to keep her out of jail." He denied bringing charges against plaintiff as retaliation for her cooperation with the FBI and insisted she was "required" to cooperate as part of her duty as a law enforcement officer. Green did not believe removal was "too harsh" a penalty because plaintiff was a "compromised employee" and "[a]

compromised employee is a dangerous employee," as they can be blackmailed, pressured, or otherwise coerced into improperly helping inmates. Also, plaintiff, as a supervisor, would have lost the trust of those in her command leading to "a significant organizational impact."

Green was not persuaded by plaintiff's claim she had no choice but to participate in the scheme because she had "an absolute sworn obligation to enforce the law to go to whatever legal agency she thought was appropriate to thwart his conduct." He found plaintiff's claim she could not say no to Sherrer because he would ruin her career "laughable" because Sherrer "never fired anybody in ten years" and he "didn't have the backbone to take a serious disciplinary action against anyone." Green testified Sherrer once threatened his job when he refused to change a disciplinary action at his direction, but backed down after Green reported the threat to his chain of command. He claimed no one was afraid of Sherrer.

Green found plaintiff's testimony that the results of the administrative hearings on discipline were "predetermined" and could not be altered to be "absolutely ridiculous and besmirching." He claimed thirty to forty percent of disciplinary actions were "altered" during his tenure.

Green testified he considered bringing disciplinary charges against other DOC employees who may have been involved with Sherrer and asked SID to investigate Simms, Collins, and Miller. He claimed SID was "unable to secure evidence to support the charges" against them because it could not get transcripts from the FBI. He opined SID lacked the authority to compel retired employees to come back for interviews even after seeing a statute giving the Commissioner authority to institute proceedings. When shown the email with Soltys, Green maintained that the Attorney General's office advised him that he could not bring charges against retired persons and, although he disagreed with that conclusion, he was not permitted to make his "own legal decisions." Other than plaintiff, Green did not receive information about any other DOC employees connected with Sherrer who were still working at the time.

On cross-examination, Green agreed he talked to Bolden about whether the DOC had the ability to pursue retired individuals for discipline on multiple occasions. He did not recall if he told Bolden he had to "check with the Attorney General," but he did not do so because he "had in [his] knowledge an opinion from Deputy Attorney General Laurie Hodian who told [Green] that is was illegal to proceed against retired employees."

A-4794-15T2

The DOC rested. After several days of charge conferences,[2] the DOC renewed its motion for a directed verdict pursuant to Rule 4:40-1 and also sought to dismiss the punitive damages claim, arguing there was no evidence of egregious conduct. The DOC argued plaintiff was not entitled to CEPA protection as a matter of law because she: (1) was not a whistleblower since she was involved in the wrongful conduct and only reported Sherrer's unlawful conduct when the FBI interviewed her after Sherrer was arrested and he advised them of her involvement; and (2) failed to provide the required written notice to afford the DOC an opportunity to take remedial action. The court reserved judgment on the motion and proceeded to summations.

The jury unanimously found plaintiff proved the reason why the DOC "took adverse employment action against her was to intentionally retaliate against her because she cooperated with the FBI or for her grand jury testimony, in violation of [CEPA]."

Before the jury returned to the courtroom for additional testimony as to damages, the DOC moved for a judgment notwithstanding the verdict (JNOV) under Rule 4:40-2, and renewed its motion to dismiss the punitive damages claim. The court initially deferred ruling, but then ruled it was a jury question

---

[2] There are no challenges to the jury charges on appeal.

to decide between "two competing versions of the same circumstances." The court determined it was for the jury to decide "any issues of intent or state of mind" as to the issue of punitive damages.

After additional testimony from plaintiff, several written questions from the jury on the issue of retirement, additional closing arguments, and a motion for a mistrial, the jury unanimously found plaintiff would have retired on or after April 1, 2012, if she had not been terminated in January 2012. It awarded plaintiff $1,000,000 for emotional distress. The DOC again moved for JNOV and argued the $1,000,000 award was "shocking" and showed bias.[3]

After additional closing arguments as to punitive damages, the jury found plaintiff proved by clear and convincing evidence, "the upper management at [the DOC] acted maliciously and in wanton and willful disregard of [p]laintiff's rights in terminating [p]laintiff and that the termination of [p]lainitff constituted especially egregious or outrageous conduct." The jury awarded plaintiff punitive damages of $6,500,000.

Plaintiff filed a post-trial motion for, among other things, reinstatement to her former position, rescission and expungement of any disciplinary actions,

_____

[3] On appeal, the DOC does not challenge the compensatory damages awarded.

A-4794-15T2

back pay, and attorney's fees and costs.  Defendant again moved for JNOV, a new trial, and remittitur of punitive damages.

The trial court denied the DOC's motions for JNOV, a new trial, and remittitur of punitive damages.  The court concluded participation in the illegal conduct was not a per se bar to recovery under CEPA and found plaintiff engaged in whistleblowing by cooperating with the FBI and testifying before the grand jury.  The trial court also found plaintiff met one of the exceptions to the written notice requirement and that, in any event, oral notice sufficed.

The court granted substantially all of plaintiff's motions, including reinstatement to her position of Corrections Sergeant as of April 1, 2016, with "full fringe benefits and seniority rights; and the compensation for all lost wages; benefits and other remuneration."  The DOC was permitted to place plaintiff on paid administrative leave until April 1, 2017, at which time she would retire.  The court also granted plaintiff's motion to rescind and remove all disciplinary actions from her personnel file and directed the DOC to notify the Department of Treasury of the reversal.

A separate judgment awarded plaintiff:  (1) $319,879.74 for back pay; (2) $69,831.26 for net lost wages, benefits and other remuneration; (3) $1,000,000 for emotional distress damages; (4) $6,500,000 for punitive damages; (5)

$92,950 for prejudgment interest; and (6) $35,713 for compensation for negative

tax consequences of the economic damages.[4]  The court also entered judgment

in favor of plaintiff's counsel in the amount of $1,234,875 for attorney's fees

after a fifty percent lodestar enhancement, and $31,999.10 for costs.  This appeal

followed.

The DOC raises the following points:

> POINT I
> THE CEPA CLAIM SHOULD HAVE BEEN DISMISSED ON DIRECTED VERDICT.
>
> A. Easley Did Not "Blow the Whistle."
>
> B. Easley Failed to Provide Written Notice as Required by CEPA.
>
> > 1. The Trial Court's Strict Interpretation of the CEPA Notice Provision Thwarts Legislative Intent.
> >
> > 2. The Written Notice Requirement Should be Read in Pari Materia with the Requirements that the Employer Post Notices in the Workplace.
>
> C. Easley Failed to Establish Pretext.

---

[4]  Plaintiff withdrew her claim for compensation for the income tax generated by the non-economic damage award.

POINT II
THE DOC SHOULD BE AFFORDED A NEW TRIAL GIVEN THE TRIAL COURT'S NUMEROUS EVIDENTIARY ERRORS.

A. The Trial Court's Admission of Hearsay Statements Regarding Other DOC Employees Constituted Harmful Error.

B. The Trial Court's Admission of Irrelevant Portions of Commissioner Lanigan's Senate Confirmation Hearing Constituted Harmful Error.

C. The Trial Court's Admission of Hearsay Documents Regarding Easley's "Victim" Status Constituted Harmful Error.

D. The Trial Court's Refusal to Strike Part of Counsel's Punitive Damages Summation Constituted Harmful Error.

E. The Juror Question Concerning Personal Retaliation Is Evidence of Bias, Passion, and Prejudice.

POINT III
THE CLEARLY EXCESSIVE PUNITIVE DAMAGES AWARD CONSTITUTED A MISCARRIAGE OF JUSTICE AND SHOULD BE VACATED.

A. Easley Failed to Submit Clear and Convincing Evidence of Egregious Conduct.

B. The Trial Court Erred in Failing to Vacate the Exorbitant Award.

POINT IV
THE TRIAL COURT ABUSED ITS DISCRETION IN
REINSTATING EASLEY.

POINT V
THE TRIAL COURT ABUSED ITS DISCRETION IN
GRANTING THE FEE APPLICATION AS WELL AS
THE FEE ENHANCEMENT REQUEST.

> A. The Trial Court Abused Its Discretion in
> Refusing to Deduct Unnecessary Fees and
> Expenditures.

> B. The Trial Court Abused Its Discretion in
> Awarding a Fee Enhancement.

## II.

We first address the DOC's contention plaintiff's CEPA claim should have been dismissed on directed verdict because plaintiff did not present a prima facie case. Specifically, the DOC argues: (1) plaintiff's actions "did not rise to the level of whistleblowing as a matter of law;" (2) plaintiff did not provide written notice to the DOC to "afford it an opportunity to correct the problem;" and (3) plaintiff "presented no evidence of similarly situated employees to support her pretext claim."

Our scope of review of a trial court's denial of a motion for a directed verdict is well settled. When reviewing a ruling by a trial court on a motion for involuntary dismissal under Rule 4:37-2(b), directed verdict under Rule 4:40-1,

or JNOV under <u>Rule</u> 4:40-2, an appellate court applies "the same standard that governs the trial court." <u>Smith v. Millville Rescue Squad</u>, 225 N.J. 373, 397 (2016). As with summary judgment motions, it must determine whether the evidence is "so one-sided that one party must prevail as a matter of law." <u>Frugis v. Bracigliano</u>, 177 N.J. 250, 269 (2003) (quoting <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 536 (1995)). The appellate court must accept as true all of the evidence that supports the position of the party defending against the motion. <u>Dolson v. Anastasia</u>, 55 N.J. 2, 5 (1969). Like the trial court, the appellate court is not concerned with the weight, worth, nature, or extent of the evidence. <u>Id.</u> at 5-6. "[W]here as here, the employer moves for a directed verdict based on the employee's failure to establish a <u>prima facie</u> case, the employee's evidence is also entitled to all legitimate inferences that derive therefrom." <u>Zive v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 448-49 (2005) (citing <u>R.</u> 4:37-2(b)).

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" <u>Dzwonar v. McDevitt</u>, 177 N.J. 451, 461 (2003) (quoting <u>Abbamont v. Piscataway Twp. Bd. of Educ.</u>, 138 N.J. 405, 431 (1994)). As a remedial statute, CEPA "promotes a

strong public policy of the State" and "should be construed liberally to effectuate its important social goal." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431). When enacted, CEPA was described "as the most far reaching 'whistleblower statute' in the nation." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998).

To establish a prima facie case under CEPA, a plaintiff must prove each of the following:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar, 177 N.J. at 462).]

"The evidentiary burden at the prima facie stage is 'rather modest . . . .'" Zive, 182 N.J. at 447 (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). Moreover, "[t]hese requirements must be liberally construed to

41

effectuate CEPA's important social goals." Maimone v. City of Atl. City, 188 N.J. 221, 230 (2006).

To establish a prima facie claim, plaintiff had to demonstrate she performed a whistle-blowing activity. Turner v. Associated Humane Soc'ys, Inc., 396 N.J. Super. 582, 595 (App. Div. 2007). CEPA prohibits employers from taking "any retaliatory action" against an employee who:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>>
>> (2) is fraudulent or criminal . . . ;
>
> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer . . . ; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
>>
>> (2) is fraudulent or criminal . . . ; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

The DOC first contends the trial court erred when it found plaintiff's "belated and coerced cooperation" with the FBI constituted whistle-blowing activity because she was "'forced' into the scheme against her will." It argues plaintiff, a law enforcement official "who has a duty to report illegal activity" and is held to a "higher standard of conduct," failed to report Sherrer's illegal activity for five years. The DOC maintains that allowing plaintiff to profit from her own wrongdoing would distort the purpose of CEPA, "which is to encourage employees to report illegal conduct."

The DOC contends plaintiff was not a whistleblower because she actively participated in and committed a criminal act, thereby precluding her from the protection of CEPA. As it did before the trial court, the DOC relies on unpublished Law Division opinions that it claims involve facts largely identical to plaintiff. Unpublished Law Division opinions are not binding on this court, S & R Assocs. v. Lynn Realty, 338 N.J. Super. 350, 355 (App. Div. 2001), and

have no precedential value, Rule 1:36-3.[5] The trial court distinguished the cases because the individuals there paid bribes to obtain their jobs, and were thus not entitled to their positions in the first place. We agree the cases are factually distinguishable with respect to plaintiff's former position as a correction sergeant.[6] There is a critical difference in this case. There is no suggestion in the record that plaintiff obtained her initial position with the DOC or subsequent promotion to sergeant by any improper means. Plaintiff challenges the refusal to reinstate her to her prior position as a sergeant.

The DOC argues that the trial court erred in distinguishing the unpublished opinions "on the grounds that plaintiff had been 'forced' into the scheme against her will." The DOC contends plaintiff's intent was irrelevant because "[t]he very failure to report criminal conduct subjects a law enforcement official to criminal charges for official misconduct." But see Lippman, 222 N.J. at 381 (holding watchdog employees are protected by CEPA).

---

[5] "No unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3. Unreported decisions "serve no precedential value, and cannot reliably be considered part of our common law." Trinity Cemetery v. Wall Twp., 170 N.J. 39, 48 (2001) (Verniero, J., concurring).

[6] Plaintiff paid a bribe to secure her at-will position as an assistant superintendent. She claims she was entitled to resume her former civil service protected position as a correction sergeant since there is no evidence she was promoted to sergeant as a result of bribery or other improper conduct.

Relying on Donofry v. Autotote Systems, Inc., 350 N.J. Super. 276, 288-89 (App. Div. 2001), the trial court concluded "you can be a criminal participant or participant in an illegal act and not [be] deprived" of protection under CEPA. The trial court found plaintiff credible and sincere in her testimony as to the involuntary nature of her participation.

In Donofry, we rejected the defendant's argument that the plaintiff's own role in the improper behavior precludes recovery under CEPA, noting the absence of "any New Jersey case holding that plaintiff's participation in the unlawful conduct he reports is a per se bar to a whistleblower claim." 350 N.J. Super. at 288. Although the employee's wrongful conduct is a factor, it is not necessarily dispositive. As we further explained:

> When an employer defending a whistleblower claim contends that its employee's unlawful conduct by itself, and not the employee's whistleblowing activity, was the determinative factor in a firing, the employee's conduct surely will be part of the picture from which a factfinder will determine whether the employer acted with a retaliatory motive; but it is not the whole picture.

> [Id. at 288-89.]

Plaintiff satisfied the requirements set forth in N.J.S.A. 34:19-3(b), which prohibits retaliatory action against an employee who "[p]rovides information to, or testifies before, any public body conducting an investigation, hearing or

inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer." Plaintiff provided information to the FBI in connection with its investigation into the criminal actions of Sherrer. She testified before the grand jury as to those criminal actions and her participation therein.

Although CEPA's purpose is to encourage employees to report illegal activities of employers, the statute does not expressly require the employee to come forward before being questioned by law enforcement. Nor does CEPA impose any enhanced obligations on law enforcement employees. "It is not our job to engraft requirements to a CEPA cause of action . . . that the Legislature did not include." Lippman, 222 N.J. at 388 (holding CEPA imposes no additional requirements on watchdog employees).

The trial court found plaintiff's cooperation with the FBI investigation and testimony before the federal grand jury were voluntary acts that entitled her to CEPA protection. Construing the statute liberally, the evidence presented could support a finding that plaintiff engaged in whistle-blowing activity when she cooperated with the FBI investigation and testified before the grand jury.

The DOC next asserts plaintiff failed to provide written notice of Sherrer's conduct as required by N.J.S.A. 34:19-4. The DOC argues the notice requirement applied since plaintiff made no claim that she failed to report

because she feared for her personal safety or that another DOC supervisor knew of Sherrer's action. The DOC claims plaintiff's failure to report Sherrer's conduct deprived it of the opportunity to correct the wrongdoing.

CEPA's remedial purpose includes an objective to encourage employers to correct illegal activity. To that end, the statute provides, in part:

> The protection against retaliatory action provided by this act pertaining to disclosure to a public body shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice.
>
> [N.J.S.A. 34:19-4.]

The Legislature created two exceptions to the notice requirement. An employee is not required to give the employer notice when "the employee is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer or where the employee reasonably fears physical harm as a result of the disclosure provided, however, that the situation is emergency in nature." Ibid.

The trial court rejected the DOC's argument on several occasions. Among other reasons, the court found written notice was not required where the conduct

of the plaintiff's supervisor is involved.[7]  We agree that written notice was not required by N.J.S.A. 34:19-4 under the facts presented in this case, affording plaintiff "the benefit of all favorable inferences."  Barratt v. Cushman & Wakefield, Inc., 144 N.J. 120, 130 (1996).  First, Sherrer was plaintiff's supervisor and second or third in command at the DOC.  Second, the unlawful conduct was obviously known to Sherrer because he was engaging in it.  Thus, providing written notice to Sherrer would have been futile.  "CEPA would make little sense if it required conscientious employees to disclose alleged wrongdoing to the wrongdoer, especially when the wrongdoer is the employee's immediate boss."  Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 103 (2000) (Verniero, J., dissenting).  Third, a reasonable jury could properly conclude that providing written notice would have subjected plaintiff to retaliation by Sherrer, given his high-ranking position and history of express and implied threats.  Interpreting CEPA liberally, employees should not be required to subject themselves to a known risk of retaliation to recover under the statute.

Alternatively, the DOC contends that plaintiff failed to show that the DOC's reason for terminating her was pretextual.  The DOC claims it presented

---

[7]  We disagree with the trial court's finding that oral notice could satisfy the statutory notice requirement.

a legitimate, non-retaliatory reason for terminating plaintiff – the payments plaintiff admitted making to Sherrer. The DOC contends plaintiff's conduct violated the DOC's rules and regulations and, therefore, her termination was appropriate. The DOC labels plaintiff's claim that it was protecting Sherrer as purely speculative and unsupported by any testimony or evidence.

Courts "have not required that there be proof of a direct causal link between the complaint by the employee and the retaliatory action of the employer." Battaglia, 214 N.J. at 558. Indeed, "jurors are permitted to draw an inference from all of the circumstances relating to the decision." Ibid.; see also Maimone, 188 N.J. at 237. Here, the circumstantial evidence included the temporal proximity of plaintiff's whistleblowing activity and her termination. "The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Maimone, 188 N.J. at 237. It may also include the response of plaintiff's superiors to her whistleblowing activity. Battaglia, 214 N.J. at 559.

The DOC also contends plaintiff's disparate treatment claim as it relates to pretext must fail as she presented no truly similarly situated employees. The DOC emphasizes that by the time the FBI granted it permission to proceed with

disciplinary action, plaintiff was the only remaining employee it had sufficient information to charge. The DOC asserted it could not discipline employees who were already retired. Plaintiff was also the only employee, either retired or active, who both paid a bribe to Sherrer for personal benefit and collected bribery payments from other employees on behalf of Sherrer.

If the plaintiff establishes a prima facie case of retaliation, the employer "must come forward and advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee." Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005). Assuming the defendant makes that proffer, the "plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual" and that the true motive was retaliation. Id. at 39; see Kolb v. Burns, 320 N.J. Super. 467, 477-78 (App. Div. 1999) (applying "pretext" three-step analysis, as first described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to a CEPA case). Significantly, "[p]laintiff need not prove that his whistleblowing activity was the only factor in the decision to fire him[,]" just "that it made a difference." Donofry, 350 N.J. Super. at 296. To meet this burden, plaintiff "must demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action."

Kolb, 320 N.J. Super. at 478 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).  Plaintiff may rely upon direct or circumstantial evidence, "or a combination of the two."  Donofry, 350 N.J. Super. at 292.

The trial court found that there was "no question" that the disciplinary proceeding was in retaliation for plaintiff cooperating with the FBI based on the timing.  The court determined there was sufficient evidence to present this issue to the jury.

In arguing that plaintiff presented no witnesses to contradict its claim that it had a legitimate, non-retaliatory reason to terminate her, the DOC ignores the impact of a significant portion of the evidence.  Although Soltys and other witnesses testified plaintiff was the only current and active employee available to discipline by the time the FBI investigation was concluded or the only employee for whom the FBI provided evidence of wrongdoing, that testimony was challenged throughout the trial.  Bolden, Green, Lanigan, and Soltys often contradicted themselves or claimed an employee had retired, even when presented with evidence that proved otherwise.  They claimed to be hampered by the confidential nature of the FBI investigation yet there was evidence they started investigating plaintiff before the FBI investigation was completed because of her impending retirement application.

On the other hand, the DOC presented undisputed evidence plaintiff was the only employee to also solicit or at least deliver money to Sherrer from at least two other employees. In addition, Lanigan testified plaintiff was disciplined because of her high position in the organization, as opposed to others in lesser positions.

On the whole, there was sufficient evidence presented for the jury to determine that the stated reason for plaintiff's termination was pretextual and that she was treated differently than the other employees involved in Sherrer's illegal activities. The jury asked why specific individuals were not interviewed and why the DOC did not attempt to investigate anyone other than plaintiff. Many witnesses dodged the question or gave conflicting answers. This may have influenced the jury in determining the DOC's motives in firing plaintiff were retaliatory.

We find no error in the denial of the DOC's motions for a directed verdict or JNOV. Accepting as true all of the evidence that supports plaintiff's position, and affording her all reasonable inferences, there was sufficient credible evidence for a reasonable jury to reject the DOC's claim that plaintiff was fired solely for violating department rules and regulations.

III.

We next address the DOC's argument that it is entitled to a new trial based on evidentiary errors that cumulatively deprived it of a fair trial. In doing so, we are mindful that the jury's determination whether plaintiff engaged in protected whistleblowing, whether her removal was pretextual, whether plaintiff's failure to provide written notice to her employer is fatal to her claim, and whether punitive damages should be awarded, are all highly fact-sensitive.

A.

The DOC contends that it was harmful error to admit Sherrer's indictment, plea agreement, and federal criminal judgment into evidence. It argues that these documents constituted inadmissible hearsay, were irrelevant, and "likely misled the jury" to conclude that plaintiff was the "victim of Sherrer's scheme as opposed to a participant." The DOC also claims the trial court improperly allowed plaintiff to testify about a letter from the Department of Justice that identified her as a victim. The DOC contends the letter was hearsay, highly prejudicial, and out of context. We agree.

Because these documents included an unverified and unsubstantiated legal conclusion on the main question the jury was to determine – plaintiff's status as either a victim or criminal participant – the admission of this evidence was an

53

abuse of discretion that cannot be considered harmless error. Accordingly, we are constrained to reverse and remand for a new trial.

Over the DOC's vigorous objections, plaintiff was permitted to testify about the three documents and about a letter she received from the federal prison declaring her a victim. The trial court determined the documents were admissible as federal court records through judicial notice under Rule 201(b)(4), were relevant to the issues, and not subject to exclusion on grounds of prejudice under Rule 403. N.J.R.E. 201(b)(4); N.J.R.E. 403. Thereafter, plaintiff was repeatedly referenced as the "victim" and other witnesses were questioned as to whether they were aware of plaintiff's "victim status" in the federal proceedings.

In ruling on the post-trial motions filed by the DOC, the court again found that the admission of the evidence was proper because:

> These are official records. They're relevant because it relates to the status of Ms. Easley in the criminal investigation. Determinations were made that she was a victim, that Mr. Sherrer extorted money from her, all of which corroborates her statements that she was involved in an involuntary series of transactions, that she was not there for someone who was bribing someone else which is a voluntary act.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). It is inadmissible unless it falls into one of

the recognized exceptions. N.J.R.E. 802. For a hearsay statement imbedded within another hearsay statement to be admissible, both hearsay statements must meet the requirements of an exception to the hearsay rule. N.J.R.E. 805.

Sherrer was not a party or a witness in this case. Therefore, the judgment of conviction was not admissible under Rule 803(c)(22), which permits "evidence of a final judgment <u>against a party</u> adjudging <u>the party</u> guilty of an indictable offense in New Jersey or of an offense which would constitute an indictable offense if committed in this state, <u>as against that party</u>, to prove any fact essential to sustain the judgment." N.J.R.E. 803(c)(22) (emphasis added).

Rule 803(c)(8) provides for the admission of the following public records, reports, and findings into evidence:

> Subject to Rule 807, (A) a statement contained in a writing made by a public official of an act done by the official or an act, condition, or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement, or (B) statistical findings of a public official based upon a report of or an investigation of acts, conditions, or events, if it was within the scope of the official's duty to make such statistical findings, unless the sources of information or other circumstances indicate that such statistical findings are not trustworthy.
>
> [N.J.R.E. 803(c)(8).]

The rationale for the government records exception is premised on "the special trustworthiness of official written statements" based upon "the declarant's official duty and the high probability that the duty to make an accurate report has been performed," and "to avoid the necessity of compelling a public official to leave his daily functions to testify as to an event which he will most likely not remember." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 803(c)(8) (2018); see also Villanueva v. Zimmer, 431 N.J. Super. 301, 314 (App. Div. 2013).

Under Rule 201(b)(4), courts may take judicial notice of "records of the court in which the action is pending and of any other court of this state or federal court sitting for this state." Under Rule 201(d), "[a] court shall take judicial notice if requested by a party on notice to all other parties and if supplied with the necessary information." N.J.R.E. 201(d). Rule 201(e) requires that parties be given an opportunity to be heard on the question of judicial notice. N.J.R.E. 201(e). And finally, under Rule 201(f), "[i]n determining the propriety of taking judicial notice of a matter or the tenor thereof . . . the rules of evidence shall not apply except Rule 403 or a valid claim of privilege." N.J.R.E. 201(f).

It is not clear on this record whether the DOC was given notice of a request by plaintiff for the trial court to take judicial notice of the documents. On appeal, the DOC challenges the admission of the evidence under Rule 403.

In Villanueva, the court examined whether the trial court erred in denying the plaintiff in a personal injury case the right to present a Social Security Administration (SSA) determination that she was disabled as presumptive evidence of her disability and inability to work. 431 N.J. Super. at 312. The court found that the SSA determination was hearsay and the only possible exception was the public records exception under Rule 803(c)(8). Id. at 313-14. The court determined Rule 803(c)(8) did not authorize admission of the SSA determination because "[t]he conclusion of a federal administrative law judge (ALJ) or the SSA itself that a person is disabled is neither an 'act done by the official' nor is it 'an act, condition or event observed by the official.'" Id. at 317. It found that "'[f]indings' by a public official are only admissible under the rule if they are statistical–a qualifier obviously inapplicable to an SSA disability determination." Id. at 318. The court also found that "[t]he lack of a meaningful adversarial process with respect to the cause, existence and extent of a plaintiff's alleged disability renders the SSA's conclusions on that issue unreliable." Ibid.

Similarly, the "findings" contained within the hearsay documents that plaintiff was a victim of extortion by Sherrer are likewise unreliable because of the lack of a meaningful adversarial process with respect to the nature and extent of plaintiff's participation in Sherrer's extortion and bribery scheme. No evidence was presented by plaintiff to substantiate the determination by the United States Attorney or the federal court that plaintiff was a victim. Nor was any evidence presented with respect to any determination that plaintiff's role in the extortion and bribery scheme was not voluntary. Plaintiff's status as a victim or as a participant was not the focal point of those proceedings. Indeed, prosecutors routinely decline to prosecute unindicted co-conspirators to gain their cooperation in prosecuting the primary target of an investigation. Rather, the evidence presented only established that Sherrer pleaded guilty to one of the twelve charges filed against him by the federal government, was sentenced for that offense, and was ordered to pay restitution to certain individuals.

Moreover, analyzed under Rule 403, any limited probative value of the three documents in evidence was substantially outweighed by the risk of undue prejudice to the DOC as the evidence bolstered the plaintiff's case and removed the question of fact to be determined from the jury. It is hard to conceive that a jury would disregard the categorization of plaintiff as a victim in the indictment

and plea agreement, which bore the government's stamp of approval, and the judgment of conviction, which bore the judge's, to find that plaintiff was not a victim.

More fundamentally, the admission of the indictment is troublesome on several levels. "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." United States v. Williams, 504 U.S. 36, 51 (1992). An indictment is nothing more than a determination by a grand jury that "the State has set forth a prima facie case that a crime has been committed and that the accused has committed it," which has also been characterized as "probable cause" for the charges brought by the prosecutor. State in the Interest of A.D., 212 N.J. 200, 218 (2012); see also Kaley v. United States, 571 U.S. 320, 328 (2014) (noting "the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime"); State v. Simon, 421 N.J. Super. 547, 555-56 (App. Div. 2011).

The central component of probable cause "is a well-grounded suspicion that a crime has been or is being committed." State v. Nishina, 175 N.J. 502, 515 (2003) (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). "[P]robable cause requires 'more than a mere suspicion of guilt' but less evidence than is

needed to convict at trial." State v. Brown, 205 N.J. 133, 144 (2011) (quoting State v. Basil, 202 N.J. 570, 585 (2010)). Thus, an indictment does not establish that the charge is based on proof by a preponderance of the evidence, much less beyond a reasonable doubt. As recognized by our Supreme Court sixty-five years ago, an indictment "in no wise establishes the truth of the charge or the presence of sufficient legal proof thereof." State v. Orecchio, 16 N.J. 125, 132 (1954). An "indictment 'proves nothing,' 'carries no element of guilt' and does not in any degree 'take from the accused his presumption of innocence.'" Ibid. (quoting State v. Ellenstein, 121 N.J.L. 304, 312 (Sup. Ct. 1938)).

"[A]n indictment may be based upon hearsay evidence," United States v. Steele, 685 F.2d 793, 806 (3d Cir. 1982), or evidence obtained in violation of the Fourth Amendment, United States v. Calandra, 414 U.S. 338, 354 (1974). Indeed, grand jury testimony is frequently based largely on hearsay that would be inadmissible at trial. State v. Ingram, 449 N.J. Super. 94, 113 (App. Div. 2017) (citing State v. Holsten, 223 N.J. Super. 578, 585 (App. Div. 1988)).

In addition, grand jury proceedings are conducted in secrecy. Fed. R. Crim. P. 6(e)(2); R. 3:6-7. The defendant and his attorney have no right to be present during the grand jury proceedings. Fed. R. Crim. P. 6(d); R. 3:6-6(a). As a result, indictments are based on the testimony of witnesses who are not

subject to cross-examination.  Nor does a suspect have a right to testify before the grand jury "or to have exculpatory evidence presented."  Williams, 504 U.S. at 52.

Admission of the indictment is particularly inappropriate in this matter. The indictment contained twelve counts.  Sherrer only pleaded guilty to count one, yet the entire indictment was admitted into evidence.  Moreover, plaintiff was not the victim in count one.[8]  In fact, plaintiff was not referred to or identified as a victim of the extortion and bribery scheme in any of the indictment's twelve counts or the forfeiture allegation.

Additionally, as is typical in federal prosecutions, the eighteen-page indictment set forth the alleged underlying facts in considerable detail, unlike indictments in New Jersey prosecutions, which typically provide only minimal information regarding the offenses charged, such as the date and location of the offense, identity of the victim, and the specific offense charged with citation to the applicable criminal code section.

Admission into evidence of the plea agreement was also error.  The plea agreement set forth the maximum statutory prison sentence (a twenty-year term)

---

[8]  Count one alleged attempted extortion of Individual 1, identified as a former DOC employee who was laid off in 2010 due to budgetary problems.

A-4794-15T2

and statutory maximum fine ($250,000) for the offense Sherrer was pleading guilty to. Even criminal juries are not told the sentencing range of the offenses a defendant is alleged to have committed.

The plea agreement also set forth restitution requirements and forfeiture of assets. It states "Sherrer agrees that as Deputy Commissioner and . . . . Assistant Commissioner with the [DOC], having held those positions during the time of the offenses, that he was a public official in a high-level decision-making position." Notably, the agreement states that it "was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Lydell B. Sherrer. This agreement does not prohibit . . . any third party from initiating or prosecuting any civil or administrative proceeding against Lydell B. Sherrer."

It bears repeating that Sherrer was neither a party nor a witness in this case, plaintiff was not a victim of the extortion count Sherrer pleaded guilty to, and the DOC was not a party in the federal criminal proceedings. Therefore, the plea agreement and judgment of conviction have no collateral estoppel or res judicata consequences in this case.

In addition, in Evans v. United States, the Supreme Court held that to prove the offense of extortion "under color of official right" in violation of 18

62

U.S.C. § 1951, "the Government need only show that a public official has obtained a payment to which he is not entitled, knowing that the payment was made in return for official acts." 504 U.S. 255, 268 (1992). The extorter is the "sole wrongdoer." Id. at 283 (Thomas, J., dissenting). "With bribery, in contrast, the payor knows the recipient official is not entitled to the payment; he, as well as the official may be punished for the offense." Ibid. Thus, plaintiff could have been prosecuted for paying a bribe to Sherrer to become an assistant superintendent. The fact that the government chose not to charge her with bribery does not amount to a finding she did not commit that offense. Cooperating witnesses frequently avoid prosecution or receive more favorable plea offers because the government is focused upon convicting the more seriously culpable actor.

While plaintiff was certainly free to argue she was a victim of Sherrer's unlawful conduct to the jury through her own testimony or other admissible evidence, the admission of the three documents and her testimony about the letter proclaiming her victim status, a central contested factual issue in the case, was error. While we are convinced the documents were inadmissible, the impact of the error was magnified by the absence of a jury instruction as to the limited use of the evidence in connection with determining a central issue in the case.

63

B.

The DOC further argues the trial court erred in allowing plaintiff to testify Sherrer told her about other DOC employees who paid for various positions as an admission by a party-opponent. Specifically, plaintiff disclosed, for the first time, that SID investigator Bolden paid Sherrer for his position despite her lack of personal knowledge of that allegation. The statements were used by plaintiff to show she was treated disparately from other employees who paid bribes to Sherrer. The DOC contends that the trial court "compounded its error" by refusing to issue a limiting instruction. The DOC maintains that the admission of this statement about Bolden "was particularly prejudicial and likely contributed to the jury's view that Easley had, in fact, been treated differently than at least one other similarly-situated DOC employee."

The testimony about Bolden was given on the first day of trial. In the context of explaining why she had not come forward immediately upon hearing of Sherrer's arrest, plaintiff testified she was still afraid of Sherrer's "powerful" connections and did not feel she could report to SID because Sherrer put Bolden in charge. When asked if Sherrer told her anything about whether Bolden paid him for his position, plaintiff testified "Yes, he said Bolden had paid him for that position. He said that he wasn't qualified, but he put him in that position."

Plaintiff stated that she did not mention Bolden to the FBI because he was "in charge of SID and the Department and [she] was just afraid it was going to backfire."

The DOC objected at the time of the testimony. The court allowed the question as "a statement of a party opponent" and said "we'll talk about all that." Several days later, the court heard argument as to plaintiff's position that Sherrer's statements to her were admissible without a limiting instruction under Rule 803(b)(4) as a statement of a party-opponent and the DOC's position that the hearsay exception did not apply because he was acting outside the scope of his employment in extorting individuals. N.J.R.E. 803(b)(4). The court reversed its earlier ruling that the statements required an instruction, finding that CEPA's underlying policy "outweighs the normal concerns on an admissibility of a statement made by someone who is acting or not acting within the scope of his employment." Relying on Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455, 463 (1998), the court found plaintiff's statement admissible and that the jury could consider it without an instruction.

Rule 803(b)(3) permits admission of "a statement by a person authorized by the party to make a statement concerning the subject." Rule 803(b)(4) provides that a statement is not excluded by the hearsay rule if it was made "by

the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." N.J.R.E. 803(b)(4). The DOC argues the trial court erred in admitting the statements about Sherrer's unlawful conduct because Sherrer was not a defendant in the case and because the statements "were neither authorized by DOC nor did they concern a matter within Sherrer's scope of agency or employment."

Sherrer was in upper management when he allegedly spoke to plaintiff about other employees paying him for positions, and had influence in the promotion of employees, as evidenced by, among other things, his ability to promote plaintiff to the assistant superintendent position despite her lack of qualifications for the position and poor performance at the interview. Sherrer's unlawful conduct in extorting and accepting bribes from plaintiff and other DOC employees was not contested at trial.[9]

---

[9] Plaintiff's testimony that Sherrer said he received a bribe from Bolden to be put in charge of SID may have also been admissible as evidence of her state of mind without being offered to prove the truth of its contents. If used in that manner, it does not constitute inadmissible hearsay. N.J.R.E. 801(c) (defining hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"); see State v. Coder, 198 N.J. 451, 464 (2009) (reaffirming that evidence not offered for the truth of the matter asserted is not hearsay).

A-4794-15T2

To be sure, Sherrer was not authorized by the DOC to engage in extortion or bribery; nor was he authorized to make statements regarding such criminal conduct. Therefore, the statements were not admissible under Rule 803(b)(3).

In contrast, Rule 803(b)(4) does not require that the statements be "authorized" by the employer in order to be admissible. While the statements in question pertained to conduct that was clearly illegal and in violation of the DOC's rules and regulations, in addition to being unauthorized and not made in execution of the employment relationship, they were uttered while Sherrer was still Deputy Commissioner and described actions undertaken in that position. But for his employment status, the extortion and bribery scheme would not have been possible. "The current Rule only requires that the statement was made by an agent, that the agency existed at the time of the statement, and that the statement concerned a matter within the scope of the agency." Biunno, Weissbard & Zegas, cmt. 4 on N.J.R.E. 803(b)(4) (citing Griffin, 225 N.J. at 419-20). Therefore, the statements were admissible under Rule 803(b)(4). Consequently, the trial court did not err in allowing plaintiff to testify Sherrer told her about other DOC employees who paid him to obtain desired positions as a vicarious admission by a party-opponent.

A-4794-15T2

## C.

The DOC also contends the trial court's admission of "irrelevant portions" of Lanigan's senate confirmation hearing constituted harmful error. It claims the testimony about Sherrer lying to the senate committee "clearly was to cast Commissioner Lanigan in a bad light, namely by suggesting that the Commissioner knew Sherrer was a 'liar.'" The DOC contends the limiting instruction given by the trial court was "simply too little, too late" and the admitted testimony was "of limited relevance" but could be treated by the jury as a reason why plaintiff did not report Sherrer to the Commissioner.

Prior to Lanigan's testimony, the DOC reminded the court that it issued orders limiting Lanigan's testimony to "his personal knowledge of things involving Lisa Easley and this FBI extortion investigation of Lydell Sherrer." Plaintiff sought to introduce testimony from Lanigan's 2010 confirmation hearing before the Senate Judiciary Committee that the DOC argued was not related to the extortion; the DOC renewed its in limine motion to exclude such testimony. The court previously denied the motion as premature. Plaintiff argued that evidence of the close relationship between Lanigan and Sherrer and Lanigan's loyalty to Sherrer even after there was evidence of his lies was relevant to the issue of retaliation. The court found its prior order did not

prohibit this line of questioning because it had ruled that Lanigan must testify as to personal knowledge including "the Sherrer investigation, the commissioner's knowledge of [the DOC's] involvement with the Sherrer scandal, which is a pretty broad area, and the commissioner's knowledge with respect to the client's termination, very narrow."

Plaintiff played the twenty-minute audio recording of the hearing before the jury to refresh Lanigan's recollection as to "what words [he] used" when he "conveyed to Senator Cardinale based upon his questioning, that at that time [he] had no reason to question [Sherrer's] integrity." The exchange between the Senator and Lanigan was adversarial.

In the section of transcript provided, Senator Cardinale asked Lanigan if Sherrer was "telling the truth when he said our capacity in our state prisons was such that we could house 2,000 more." Lanigan responded that he had "no reason to doubt that statement or Commissioner Sherrer's integrity" and that he "believed that he would have been forthright and honest with the committee." Senator Cardinale discussed Camden County's desire to have the Riverfront facility torn down and then to spend $100 million to "privatize it to build another facility." He challenged Lanigan, asking whether he believed Sherrer "acted appropriately as an employee of state government in misleading the state house

69

commission [into] making a determination to tear down a prison, a $100 million facility." Lanigan responded that he would be "appalled" to learn that Sherrer deliberately misled the committee and would likely fire him but he said "what I know of Commissioner Sherrer I don't believe he would do that."

In response to whether he would provide "the total picture" to the committee if the facility had not yet been torn down and he was asked to testify about the issues, Lanigan testified that he did not know whether or not "they knew" of the issue and "just did not mention Camden County," but he thought "that they were forthright and honest with [the committee]." Senator Cardinale then stated that he believed that "they concealed from the state house commission the true nature of the need for correctional facilities in that geographical location and the consequence of that concealment" is that the State is going to have to provide $100 million to Camden, a "ward of the state," to "do whatever it's going to do." Senator Cardinale asked if Lanigan intended to keep Sherrer, an at-will employee, on his staff. When Lanigan said he has "no reason not to believe that Mr. Sherrer should not be kept in our employ," Senator Cardinale responded, "[t]hat speaks volumes . . . ."[10]

---

[10] Only a portion of the transcript of the confirmation hearing was provided in the record. The remainder of the Senator's sentence is cut off. It is unclear

Thereafter, the court ruled that it would instruct the jury that the political discussion of the facility was irrelevant to the issues at trial and that it was only offered "for them to test the credibility of the person who is testifying."  The DOC agreed with the instruction and plaintiff had no objection.  The court then instructed the jury as follows:

> For the past [twenty] minutes we've heard testimony and statements made primarily by a state senator in a -- in a confirmation hearing.  I do not want you to be considering the truth or falsity of any claim or no claim with respect to prison population, budgets, those kinds of things.  That's not why that was being -- that's got nothing to do with this case.  It's irrelevant.  You must disregard that for that purpose.  On the other hand, to the extent that there were statements made by the witness that . . . may or may not affect your view of his credibility, vis-à-vis what he said here, it's only allowed for that purpose.

The DOC objects solely on the ground of relevancy, claiming Senator Cardinale's comments were "highly prejudicial" and designed only to cast Lanigan in a bad light.  Plaintiff responds that the testimony was "extremely relevant" to Lanigan's "loyalty" to Sherrer and to explain his later actions in directing Soltys "to only investigate" plaintiff and in the use of the "fraudulent report" to terminate her.

---

whether the audio played for the jury included additional testimony not included in the record.

"Relevant evidence is evidence 'having a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting N.J.R.E. 401). All relevant evidence is admissible except if precluded by the rules of evidence or applicable law. N.J.R.E. 402. Although the test for relevancy "is broad and favors admissibility, relevant evidence may still be, and should be, excluded," State v. Deatore, 70 N.J. 100, 116 (1976), "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury," N.J.R.E. 403.

We first question whether the recording was actually necessary to refresh Lanigan's recollection. When asked if he recalled saying that he believed Sherrer had "told the truth" to the Commission, Lanigan responded: "I don't know that those were the words I used, but, in essence, that was what I conveyed to Senator Cardinale based upon his questioning, that at that time I had no reason to question his integrity." Lanigan did not claim he could not remember what he said. There was no need to refresh his recollection.

The trial court seemingly ignored "the established distinction between a document that is evidential and one used to refresh a witness's recollection. Once a proper foundation has been laid, a witness may examine any document

to refresh his memory." State v. Carter, 91 N.J. 86, 122 (1982); see also Lautek

Corp. v. Image Bus. Sys., 276 N.J. Super. 531, 545 (App. Div. 1994). It makes

no difference if the document is admissible as it is used only to refresh the

witness's recollection. "The admissible evidence is the recollection of the

witness, and not the extrinsic paper." Carter, 91 N.J. at 123. Even if properly

used to refresh the recollection of the witness, the document must still meet the

standards for admissibility in a separate instance before it is submitted to the

jury. "The trial judge has a duty to prevent a witness from putting into the record

the contents of an otherwise inadmissible writing under the guise of refreshing

recollection." State v. Caraballo, 330 N.J. Super. 545, 557 (App. Div. 2000).

The same reasoning applies to recordings.

We also question the relevancy of the evidence presented. The issues

being discussed at the hearing did not have a tendency to prove or disprove any

fact of consequence at the trial. Sherrer's dishonesty was not disputed – his

nickname "Lying Lydell" was often repeated during the trial. Although the

judge noted that the evidence was offered "only" to challenge Lanigan's

credibility, after hearing the audio, he recognized the testimony about the

confirmation hearing delved "into things that I think are totally irrelevant and

it's misleading this jury and I'm going to tell them."

The DOC argues plaintiff used the video to show Lanigan "supported" and "protected" Sherrer even though he "knew" Sherrer was a liar, but the record does not support that allegation. Lanigan testified he only knew Sherrer for three weeks before his confirmation hearing and he did not waver from his testimony that the information he had at the time of that hearing did not support Senator Cardinale's allegation that Sherrer had lied. Other than argument of counsel, there was no other testimony that Lanigan did anything to protect or support Sherrer.

The trial court erred in allowing the audio of the confirmation hearing to be played before the jury. The audio recording was not necessary to refresh Lanigan's recollection, it did not constitute a prior inconsistent statement, and it was not relevant to any issue other than Lanigan's credibility, despite the fact that Lanigan did not deny making the statements presented in the audio either before or after it was presented. The statements by Senator Cardinale were inflammatory. The limiting instruction given by the trial judge did not remedy the situation.

To some degree, the evidence was cumulative since Lanigan was extensively questioned regarding his testimony about Sherrer's integrity and the SID report that concluded Sherrer had not lied to the committee. Nevertheless,

A-4794-15T2

Lanigan's recollection did not need to be refreshed, the recording was inadmissible, and it prejudiced the DOC. The twenty-minute recording can hardly be characterized as a fleeting reference.

D.

In sum, each of the erroneous evidential rulings were prejudicial to the DOC by usurping the role of the jury or admitting distinctly prejudicial evidence with little or no probative value. Considered separately or collectively, the impact of these errors undermined the reliability of the resulting verdict. We are therefore constrained to reverse the judgment and remand for a new trial before a different judge. In light of this ruling, we do not reach the other issues raised by the DOC.

We offer the following guidance when considering an attorney's fee application if plaintiff prevails on retrial. The trial court must consider the terms of the retainer agreement, which provides for a contingent fee of fifty percent of the total judgment award, when determining whether a lodestar enhancement is appropriate.

Reversed and remanded for retrial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4794-15T2